HUNTER ET AL. *v.* UNDERWOOD ET AL.

No. 84–76.   Argued February 26, 1985—Decided April 16, 1985

REHNQUIST, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the case.

*James S. Ward,* Special Assistant Attorney of Alabama, argued the cause and filed a brief for appellants.

*Edward Still* argued the cause for appellees. With him on the brief were *Neil Bradley, Laughlin McDonald,* and *Christopher Coates.*†

JUSTICE REHNQUIST delivered the opinion of the Court.

We are required in this case to decide the constitutionality of Art. VIII, § 182, of the Alabama Constitution of 1901, which provides for the disenfranchisement of persons convicted of, among other offenses, "any crime . . . involving moral turpitude."* Appellees Carmen Edwards, a black,

---

†Briefs of *amici curiae* urging affirmance were filed for the National Association for the Advancement of Colored People et al. by *Samuel Rabinove* and *Richard T. Foltin;* and for NAACP Legal Defense and Educational Fund, Inc. by *Julius Chambers* and *Lani Guinier.*

*Section 182 of the Alabama Constitution of 1901 provides:

"The following persons shall be disqualified both from registering, and from voting, namely:

"All idiots and insane persons; those who shall by reason of conviction of crime be disqualified from voting at the time of the ratification of this Constitution; those who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any infamous crime or crime involving moral turpitude; also, any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote of another, or of buying or offering to buy the vote of another, or of making or offering to

and Victor Underwood, a white, have been blocked from the voter rolls pursuant to § 182 by the Boards of Registrars for Montgomery and Jefferson Counties, respectively, because they each have been convicted of presenting a worthless check. In determining that the misdemeanor of presenting a worthless check is a crime involving moral turpitude, the Registrars relied on opinions of the Alabama Attorney General.

Edwards and Underwood sued the Montgomery and Jefferson Boards of Registrars under 42 U. S. C. §§ 1981 and 1983 for a declaration invalidating § 182 as applied to persons convicted of crimes not punishable by imprisonment in the state penitentiary (misdemeanors) and an injunction against its future application to such persons. After extensive proceedings not relevant here, the District Court certified a plaintiff class of persons who have been purged from the voting rolls or barred from registering to vote in Alabama solely because of a misdemeanor conviction and a defendant class of all members of the 67 Alabama County Boards of Registrars. The case proceeded to trial on two causes of action, including a claim that the misdemeanors encompassed within § 182 were intentionally adopted to disenfranchise blacks on account of their race and that their inclusion in § 182 has had the intended effect. For the purposes of this claim, the District Court treated appellee Edwards as the representative of a subclass of black members of the plaintiff class.

In a memorandum opinion, the District Court found that disenfranchisement of blacks was a major purpose for the convention at which the Alabama Constitution of 1901 was adopted, but that there had not been a showing that "the provisions disenfranchising those convicted of crimes [were] based upon the racism present at the constitutional convention." The court also reasoned that under this Court's deci-

---

make a false return in any election by the people or in any primary election to procure the nomination or election of any person to any office, or of suborning any witness or registrar to secure the registration of any person as an elector."

sion in *Palmer* v. *Thompson*, 403 U. S. 217 (1971), proof of an impermissible motive for the provision would not warrant its invalidation in face of the permissible motive of "governing exercise of the franchise by those convicted of crimes," which the court apparently found evident on the face of § 182. App. E to Juris. Statement E–5—E–7.

On appeal, the Court of Appeals for the Eleventh Circuit reversed. 730 F. 2d 614 (1984). It held that the proper approach to the Fourteenth Amendment discrimination claim was established in *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 270, and n. 21 (1977), and *Mt. Healthy City Board of Education* v. *Doyle*, 429 U. S. 274, 287 (1977):

> "To establish a violation of the fourteenth amendment in the face of mixed motives, plaintiffs must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor in the adoption of section 182. They shall then prevail unless the registrars prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered." 730 F. 2d, at 617.

Following this approach, the court first determined that the District Court's finding of a lack of discriminatory intent in the adoption of § 182 was clearly erroneous. After thoroughly reviewing the evidence, the court found that discriminatory intent *was* a motivating factor. It next determined from the evidence that there could be no finding that there was a competing permissible intent for the enactment of § 182. Accordingly, it concluded that § 182 would not have been enacted in absence of the racially discriminatory motivation, and it held that the section as applied to misdemeanants violated the Fourteenth Amendment. It directed the District Court to issue an injunction ordering appellants to register on the voter rolls members of the plaintiff class who so request and who otherwise qualify. We noted probable jurisdiction, 469 U. S. 878 (1984), and we affirm.

The predecessor to § 182 was Art. VIII, § 3, of the Alabama Constitution of 1875, which denied persons "convicted of treason, embezzlement of public funds, malfeasance in office, larceny, bribery, or other crime punishable by imprisonment in the penitentiary" the right to register, vote or hold public office.  These offenses were largely, if not entirely, felonies.  The drafters of § 182, which was adopted by the 1901 convention, expanded the list of enumerated crimes substantially to include the following:

> "treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, [and] crime against nature."

The drafters retained the general felony provision—"any crime punishable by imprisonment in the penitentiary"—but also added a new catchall provision covering "any . . . crime involving moral turpitude."  This latter phrase is not defined, but it was subsequently interpreted by the Alabama Supreme Court to mean an act that is "'immoral in itself, regardless of the fact whether it is punishable by law.  The doing of the act itself, and not its prohibition by statute fixes, the moral turpitude.'"  *Pippin* v. *State*, 197 Ala. 613, 616, 73 So. 340, 342 (1916) (quoting *Fort* v. *Brinkley*, 87 Ark. 400, 112 S. W. 1084 (1908)).

The enumerated crimes contain within them many misdemeanors.  If a specific crime does not fall within one of the enumerated offenses, the Alabama Boards of Registrars consult Alabama case law or, in absence of a court precedent, opinions of the Alabama Attorney General to determine whether it is covered by § 182.  730 F. 2d, at 616, n. 2.  Various minor nonfelony offenses such as presenting a worthless check and petty larceny fall within the sweep of § 182, while

more serious nonfelony offenses such as second-degree manslaughter, assault on a police officer, mailing pornography, and aiding the escape of a misdemeanant do not because they are neither enumerated in § 182 nor considered crimes involving moral turpitude. *Id.*, at 620, n. 13. It is alleged, and the Court of Appeals found, that the crimes selected for inclusion in § 182 were believed by the delegates to be more frequently committed by blacks.

Section 182 on its face is racially neutral, applying equally to anyone convicted of one of the enumerated crimes or a crime falling within one of the catchall provisions. Appellee Edwards nonetheless claims that the provision has had a racially discriminatory impact. The District Court made no finding on this claim, but the Court of Appeals implicitly found the evidence of discriminatory impact indisputable:

> "The registrars' expert estimated that by January 1903 section 182 had disfranchised approximately ten times as many blacks as whites. This disparate effect persists today. In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under section 182 for the commission of nonprison offenses." 730 F. 2d, at 620.

So far as we can tell the impact of the provision has not been contested, and we can find no evidence in the record below or in the briefs and oral argument in this Court that would undermine this finding by the Court of Appeals.

Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:

> "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose

is required to show a violation of the Equal Protection Clause." 429 U. S., at 264–265.

See *Washington* v. *Davis,* 426 U. S. 229, 239 (1976). Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor. See *Mt. Healthy,* 429 U. S., at 287.

Proving the motivation behind official action is often a problematic undertaking. See *Rogers* v. *Lodge,* 458 U. S. 613 (1982). When we move from an examination of a board of county commissioners such as was involved in *Rogers* to a body the size of the Alabama Constitutional Convention of 1901, the difficulties in determining the actual motivations of the various legislators that produced a given decision increase. With respect to Congress, the Court said in *United States* v. *O'Brien,* 391 U. S. 367, 383–384 (1968) (footnote omitted):

> "Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."

But the sort of difficulties of which the Court spoke in *O'Brien* do not obtain in this case. Although understandably no "eyewitnesses" to the 1901 proceedings testified, testi-

mony and opinions of historians were offered and received without objection. These showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. See S. Hackney, Populism to Progressivism in Alabama 147 (1969); C. Vann Woodward, Origins of the New South, 1877–1913, pp. 321–322 (1971). The delegates to the all-white convention were not secretive about their purpose. John B. Knox, president of the convention, stated in his opening address:

> "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

Indeed, neither the District Court nor appellants seriously dispute the claim that this zeal for white supremacy ran rampant at the convention.

As already noted, the District Court nonetheless found that the crimes provision in § 182 was not enacted out of racial animus, only to have the Court of Appeals set aside this finding. In doing so, the Court of Appeals applied the clearly-erroneous standard of review required by Federal Rule of Civil Procedure 52(a), see *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287 (1982), but was "left with a firm and definite impression of error . . . with respect to the issue of intent." 730 F. 2d, at 620. The evidence of legislative intent available to the courts below consisted of the proceedings of the convention, several historical studies, and the testimony of two expert historians. Having reviewed this evidence, we are persuaded that the Court of Appeals was correct in its assessment. That court's opinion presents a thorough analysis of the evidence and demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks. We see little purpose in repeating that factual

analysis here. At oral argument in this Court appellants' counsel essentially conceded this point, stating: "I would be very blind and naive [to] try to come up and stand before this Court and say that race was not a factor in the enactment of Section 182; that race did not play a part in the decisions of those people who were at the constitutional convention of 1901 and I won't do that." Tr. of Oral Arg. 6.

In their brief to this Court, appellants maintain on the basis of their expert's testimony that the real purpose behind § 182 was to disenfranchise poor whites as well as blacks. The Southern Democrats, in their view, sought in this way to stem the resurgence of Populism which threatened their power:

"Q. The aim of the 1901 Constitution Convention was to prevent the resurgence of Populism by disenfranchising practically all of the blacks and a large number of whites; is that not correct?

"A. Yes, sir.

"Q. The idea was to prevent blacks from becoming a swing vote and thereby powerful and useful to some group of whites such as Republicans?

"A. Yes, sir, that's correct.

"Q. The phrase that is quite often used in the Convention is to, on the one hand limit the franchise to [the] intelligent and virtuous, and on the other hand to disenfranchise those [referred] to as 'corrupt and ignorant,' or sometimes referred to as the ignorant and vicious?

"A. That's right.

"Q. Was that not interpreted by the people at that Constitutional Convention to mean that they wanted to disenfranchise practically all of the blacks and disenfranchise those people who were lower class whites?

"A. That's correct."

.          .          .          .          .

"Q. Near the end of the Convention, John Knox did make a speech to the Convention in which he summa-

rized the work of the Convention, and in that speech is it not correct that he said that the provisions of the Suffrage Article would have a disproportionate impact on blacks, but he disputed that that would be [a] violation of the Fifteenth Amendment?

"A. Yes, sir, that is true. Repeatedly through the debates, the delegates say that they are interested in disfranchising blacks and not interested in disfranchising whites. And in fact, they go out of their way to make that point. . . . But the point that I am trying to make is that this is really speaking to the galleries, that it is attempting to say to the white electorate that must ratify this constitution what it is necessary for that white electorate to be convinced of in order to get them to vote for it, and not merely echoing what a great many delegates say. . . . [I]n general, the delegates aggressively say that they are not interested in disfranchising any whites. I think falsely, but that's what they say.

"Q. So they were simply trying to overplay the extent to which they wanted to disenfranchise blacks, but that they did desire to disenfranchise practically all of the blacks?

"A. Oh, absolutely, certainly." Cross-examination of Dr. J. Mills Thornton, 4 Record 73–74, 80–81.

Even were we to accept this explanation as correct, it hardly saves § 182 from invalidity. The explanation concedes both that discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that § 182 certainly would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation.

Citing *Palmer* v. *Thompson,* 403 U. S., at 224, and *Michael M.* v. *Superior Court of Sonoma County,* 450 U. S. 464, 472, n. 7 (1981) (plurality opinion), appellants make the further argument that the existence of a permissible motive for § 182, namely, the disenfranchisement of poor

whites, trumps any proof of a parallel impermissible motive. Whether or not intentional disenfranchisement of poor whites would qualify as a "permissible motive" within the meaning of *Palmer* and *Michael M.*, it is clear that where both impermissible racial motivation and racially discriminatory impact are demonstrated, *Arlington Heights* and *Mt. Healthy* supply the proper analysis. Under the view that the Court of Appeals could properly take of the evidence, an additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks, and it is beyond peradventure that the latter was a "but-for" motivation for the enactment of § 182.

Appellants contend that the State has a legitimate interest in denying the franchise to those convicted of crimes involving moral turpitude, and that § 182 should be sustained on that ground. The Court of Appeals convincingly demonstrated that such a purpose simply was not a motivating factor of the 1901 convention. In addition to the general catchall phrase "crimes involving moral turpitude" the suffrage committee selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks:

> "Most of the proposals disqualified persons committing any one of a long list of petty as well as serious crimes which the Negro, and to a lesser extent the poor whites, most often committed. . . . Most of the crimes contained in the report of the suffrage committee came from an ordinance by John Fielding Burns, a Black Belt planter. The crimes he listed were those he had taken cognizance of for years in his justice of the peace court in the Burnsville district, where nearly all his cases involved Negroes." M. McMillan, Constitutional Development in Alabama, 1798–1901, p. 275, and n. 76 (1955) (quoted in testimony by appellees' expert).

At oral argument in this Court, appellants' counsel suggested that, regardless of the original purpose of § 182,

events occurring in the succeeding 80 years had legitimated the provision. Some of the more blatantly discriminatory selections, such as assault and battery on the wife and miscegenation, have been struck down by the courts, and appellants contend that the remaining crimes—felonies and moral turpitude misdemeanors—are acceptable bases for denying the franchise. Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*.

Finally, appellants contend that the State is authorized by the Tenth Amendment and § 2 of the Fourteenth Amendment to deny the franchise to persons who commit misdemeanors involving moral turpitude. For the reasons we have stated, the enactment of § 182 violated the Fourteenth Amendment, and the Tenth Amendment cannot save legislation prohibited by the subsequently enacted Fourteenth Amendment. The single remaining question is whether § 182 is excepted from the operation of the Equal Protection Clause of § 1 of the Fourteenth Amendment by the "other crime" provision of § 2 of that Amendment. Without again considering the implicit authorization of § 2 to deny the vote to citizens "for participation in rebellion, or other crime," see *Richardson* v. *Ramirez*, 418 U. S. 24 (1974), we are confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of § 182 which otherwise violates § 1 of the Fourteenth Amendment. Nothing in our opinion in *Richardson* v. *Ramirez*, *supra*, suggests the contrary.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL took no part in the consideration or decision of this case.