Reverend George W. **VEREEN**, et al., Plaintiffs,

v.

**BEN HILL COUNTY, GEORGIA**, et al., Defendants.

Civ. No. 88–4–ALB/AMER(DF).

United States District Court, M.D. Georgia, Albany Division.

Aug. 2, 1990.

---

Laughlin McDonald, Neil Bradley, Kathleen Wilde, Dereck Alphran, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., H. Christopher Coates, Milledgeville, Ga., for plaintiffs.

James E. Humes, II, Columbus, Ga., W. Ashley Hawkins, Forsyth, Ga., Phillip Hartley, Gainesville, Ga., F. Houser Pugh, Columbus, Ga., Ben B. Mills, Jr., Fitzgerald, Ga., David L. Mincey, Jr., Roberta, Ga., Charles R. Adams, III, Fort Valley, Ga., C. Truett Martin, Dawson, Ga., for defendants.

FITZPATRICK, District Judge.

Plaintiffs in the above styled complaint have brought suit against the defendants alleging that the practice of using grand juries to select members of county boards of education denies plaintiffs their rights guaranteed by the First, Thirteenth, Fourteenth, and Fifteenth Amendments of the United States Constitution and violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Plaintiffs assert that the practice in question was established with a racially discriminatory purpose and therefore should be struck down by this court.[1] After the filing of the suit, the court certified a defendants' class consisting of all counties in Georgia that use the grand jury method of selecting their boards of education. The Ben Hill County Board of Education and the Ben Hill County Grand Jury serve as the class representatives.

The parties to this action decided to initially adjudicate a single threshold issue in what has been termed phase one of this case. The sole issue to be decided by the court in phase one is whether the 1872 Education Act authorizing grand jury selection of county boards of education was adopted with a racially discriminatory purpose. Plaintiffs assert that an affirmative answer to that question establishes that the grand jury system of appointing members of county boards of education in Georgia is invalid. Defendants counter that, based on the manner in which plaintiffs have styled their complaint, a negative answer conclusively resolves plaintiffs' claim in favor of the defendants, thereby upholding defendants' right to have grand juries select board of education members. The court, sitting without a jury, held phase one of the trial of this case on December 11, 12, and 13, 1989, and hereby issues the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Immediately after the Civil War, the Georgia General Assembly came under the control of white Democrats, many of whom espoused a policy of white supremacy. Transcript, p. 39. Those who favored white supremacy gained control of the Georgia General Assembly and passed laws that restricted suffrage, office holding, jury duty, and schooling to whites. *Id.* at 40. Partly in response to the enactment of laws restricting the rights of blacks, the Federal Government in 1867 adopted a series of Reconstruction Acts that provided for the reorganization of Georgia's government under the supervision of the United States Army. *Id.*

While under the guidance of the Federal Government, Georgia held a constitutional convention in early 1868 to reorganize its government. The new constitution adopted at this convention, which had a Republican

---

1. Grand jury selection of county school board members was instituted under and authorized by Ga.Laws 1872, p. 279, perfected and super- seded by Ga.Laws 1872, p. 64, (Plain. exhs. 50 and 51, Def exh. III. 8) (hereinafter "the 1872 Education Act").

majority in control, guaranteed blacks citizenship, equal protection of the law, and the right to vote. Transcript, p. 46–47. The 1868 constitutional convention also took the first significant step toward developing public education in Georgia by adding a provision to the 1868 Georgia Constitution which authorized the Georgia General Assembly to create a statewide public education system. Plain. exhs. 22 & 23.

In accordance with the 1868 Constitutional provision that authorized the legislature to establish a statewide public education system, the 1870 Georgia General Assembly passed a bill on October 13, 1870 that created a free public school system in Georgia (hereinafter "the 1870 Public Education Act"). Ga.Laws 1870, p. 49. The 1870 Public Education Act called for the establishment of a board of education in each county to consist of "one person from each militia district, and one person from each ward in any city in the county, and one from each incorporated ward or incorporated town, who shall be elected by the legal voters of said district, ward or incorporated town." *Id.* at 53, section 16. Under the 1870 Public Education Act, the first school board elections were set to take place on the first Saturday in January of 1871. *Id.*

The elections for school board members took place as scheduled in January of 1871 amid a racially charged atmosphere.[2] The elections process, structured according to militia districts, proved to be a complex, cumbersome, ill supported system. Transcript, p. 338–39. There was not a great deal of interest in the school board elections nor a very good turnout for them. Transcript, p. 281. At the conclusion of the

elections, a significant number of positions remained vacant[3] due to various problems in implementing the elections, including a lack of public confidence in the permanency of the system of free public education. Report of John R. Lewis, State School Commissioner, Commissioner's Report for the year 1871, December 12, 1870, p. 6–7 (Def. exh. IV. 2). Once the newly elected school boards were in place, little was accomplished in many counties because of the numerous vacancies and the inability of some boards to form a quorum. Report of John R. Lewis, State School Commissioner, Commissioner's Report for the year 1871, December 12, 1870 (Def. exh. IV. 2).

After the 1871 school board elections, the political landscape of Georgia again changed. By the end of the year, the Democratic Party of Georgia wrested political power back from the Republican Party. With the election and inauguration of Democratic Governor James M. Smith in January of 1872, the Democratic Party gained control of both the legislative and executive branches of the state government. The Democrat's success in 1872 produced a Georgia General Assembly that was dominated by legislators who were determined to restore white supremacy as a way of life and thwart any and all black participation in Georgia politics. *See,* E. Foner, Reconstruction America's Unfinished Revolution 1863—1877; Def. Exh. II. 14; Transcript p. 81.

There is little doubt that the 1872 Georgia General Assembly passed numerous bills that were specifically designed to disenfranchise blacks and discourage them from taking part in the political process.[4]

---

2. The racial antagonism surrounding the elections was reflected in various newspaper articles such as the *Augusta Chronicle and Sentinel's* warning against the dangers of electing blacks which read: "We may rest assured that if we fail to present and vote for good men the scalawags and negroes will take possession of this most important matter." Transcript p. 67; Plaintiffs' exhibit 33. Another example is the *Daily Sun's* article entitled "Whites Win," which stated that: "The election for a County Board of Education and Trustees excited little comment yesterday until it was reported the negroes were endeavoring to elect colored men in the First and Ninth wards. The following shows the re-

sult, which is another white man's triumph. A negro has not yet been elected to an office in Muscogee County since bayonets were removed." Plaintiffs' exhibit 37.

3. Approximately twenty-five percent (25%) of the available positions remained vacant after the 1871 school board elections. Transcript, p. 260.

4. The 1872 Georgia Legislature abolished ward elections for the City of Atlanta in a clear attempt to eliminate black representation on the Atlanta City Council and also abolished elec-

This same legislature enacted the 1872 Education Act in January of 1872.

The 1872 Education Act was passed with the support of four black legislators, including Tunis Campbell, a champion of black political rights who was on the Education Committee and therefore privy to all the debates and discussions that took place concerning the Act. Before the Act was perfected and reenacted in August of 1872, four attempts were made to amend the section of the 1872 Education Act that dealt with how County Boards of Education would be chosen. No member of the General Assembly, however, ever tried to change or remove the grand jury appointment provision of the Act. Transcript, p. 311.

The significance of the 1872 Education Act, as it relates to the instant case, is that it converted provisions of the 1870 Public Education Act that provided for public election of county boards of education to a procedure in which the grand jury of each county would appoint members of the county's board of education. Ga.Laws 1872, p. 279, perfected and superseded by Ga.Laws 1872, p. 64. The change in the method of choosing school board members occurred during a period of racial strife and after it became apparent that the elective system was unworkable and would have to be changed in order for this new public education system to succeed. *See,* Report of John R. Lewis, State School Commissioner, Commissioner's Report for the year 1871, December 12, 1870 (Def. exh. IV. 2).

## II. CONCLUSIONS OF LAW

In this phase of the case, the court is concerned solely with determining whether or not the 1872 Education Act authorizing grand jury selection of county boards of education was adopted with a racially discriminatory purpose. Deciding this issue requires the court to take a long look back into history to determine both the attitudes and motivations of legislators during some of the most turbulent years in Georgia's history. To do so with any kind of clarity

is a monumental task, for one can never really be sure of what genuinely motivated legislators to enact a particular statute. The difficulty involved in discerning the motivation of the Georgia legislators who passed the 1872 Education Act is made even more arduous by the fact that the court must look back over one hundred seventeen years without the benefit of contemporary statements by members of the Georgia General Assembly, minutes of its meetings, reports, or a legislative record. Nevertheless, countless other courts have had to undertake such a task and in that regard the court does have some guidance in how it should go about meeting the challenge now before it.

■ The applicable law clearly mandates that in seeking to invalidate the 1872 Education Act, plaintiffs must prove that racial discrimination was a substantial or motivating factor behind passage of the Act. *Village of Arlington Heights v. Metro Housing Dev.,* 429 U.S. 252, 270 & n. 21, 97 S.Ct. 555, 566 & n. 21, 50 L.Ed.2d 450 (1977); *Mt. Healthy City School District Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). "Determining whether invidious discriminatory purpose was a motivating factor [in the passage of a statute] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Subjects of proper inquiry in determining whether racially discriminatory intent existed include:

> The historical background of the decision, ... particularly if it reveals a series of official actions taken for invidious purposes ...; [t]he specific sequence of events leading up [to] the challenged decision ...; [d]eparture from the normal procedural sequence ...; substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached ...; [and] [t]he legislative or administrative history may be highly rel-

---

tions for the county commission in majority black McIntosh County in another move that

was designed to prevent blacks from gaining political power. Transcript, p. 80–81.

evant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Id.* at 268–69, 97 S.Ct. at 564–65.

Plaintiffs assert that the factors enumerated in *Village of Arlington Heights* lead to the inescapable conclusion that the motivation behind passage of the 1872 Education Act was a desire by the Georgia General Assembly to discriminate against blacks. Plaintiffs note that the historical background surrounding the Georgia General Assembly that passed the 1872 Education Act indicates that it was an elected body that often acted with a racially discriminatory purpose.

Furthermore, plaintiffs demonstrate that events leading up to the enactment of the 1872 Education Act saw the Georgia General Assembly transformed from a body that tolerated the participation of blacks in the political process to one that was controlled by legislators who espoused the creation of a white supremacist society that prevented blacks from participating in the political process. Plaintiffs also point out that the grand jury selection process was a departure from the previous manner in which school board members were selected. According to the plaintiffs, an historical look at the 1872 Georgia General Assembly reveals that almost all its actions were motivated by racial concerns. All these points put forth by the plaintiffs to support their claim are well taken. The court finds, however, that for the specific purpose of determining the intent behind the enactment of the 1872 Education Act, plaintiffs apply the *Village of Arlington Heights* criteria too broadly.

■ Plaintiffs show a legislature concerned with deterring black political activity but they fail to demonstrate that blacks were actively involved in school board elections or that in 1872 Georgia legislators considered school board membership as an area in need of legislative action designed to thwart black political involvement. Plaintiffs prove that the Georgia General Assembly acted to change election processes it feared aided blacks in getting elected but they never demonstrate that any legislators perceived the school board election process as an effective means for blacks to enhance or develop social, economic, or political power. Nor have plaintiffs shown that black membership on local boards of education was significantly different under the elective system as opposed to the grand jury appointed system. Plaintiffs demonstrate the discriminatory propensities and practices of the 1872 Georgia General Assembly but do not link them as the motivation or intent behind passage of 1872 Education Act.

The case presented by the plaintiffs amounts to a request that the court find that the Georgia General Assembly passed the 1872 Education Act with a racially discriminatory motive because of the political and social views of the majority party that controlled the Georgia General Assembly at the time the statute was enacted.[5] Plaintiffs would in effect have the court find that discriminatory intent can be demonstrated by proving that the statute in question was passed by a legislature dominated by white supremacists who were determined to discriminate against blacks and had done so on previous occasions. The law that the court must follow, however, does not allow it to make such a finding.

---

5. Plaintiffs' primary witness, University of South Alabama professor Dr. Peyton McCrary, gave the following testimony in response to questions from the court.
THE COURT: It seems to me that your opinion [of the existence of a racially discriminatory intent] is based to a great degree on the fact that the General Assembly of Georgia in 1872 was overwhelmingly Democratic, which was commonly observed as a party of white supremacy and that is the underlying basis that pervades your opinion that the motivation to discrimi-

nate must have been there because of the political and social views of the majority party that controlled the General Assembly and the convention. Is that a fair statement?
WITNESS McCRARY: It certainly is the most important single factor, yes.
THE COURT: I don't mean exclusively, but your opinion is based more or less bottom line on that. Is that right?
WITNESS McCRARY: Yes, your honor.
Transcript, p. 229.

In *Hunter v. Underwood*, 471 U.S. 222, 230, 105 S.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985), the Supreme Court, in attempting to determine whether there was discriminatory intent behind the passage of a provision in the Alabama Constitution that disenfranchised persons convicted of crimes involving moral turpitude, considered in its deliberations the fact that the provision was passed by an Alabama Constitutional Convention organized to establish white supremacy in the State of Alabama. Before striking down the provision as unconstitutional however, the Court examined the provision and determined that it was drafted in a manner that was specifically designed to carry out the discriminatory intentions of the Convention convened for the purpose of disenfranchising blacks. *Hunter*, 471 U.S. at 233, 105 S.Ct. at 1922.

This court's reading of *Hunter* leads it to conclude that the court cannot make a finding of discriminatory intent based *solely* on a showing that the Georgia General Assembly which passed the 1872 Education Act was controlled by white supremacists who passed discriminatory laws during a period of great hostility toward blacks. In order to strike down the statute as unconstitutional, the evidence must show that the decision to enact the 1872 Education Act was tainted by the racial animus that infected the 1872 Georgia General Assembly. *See Hunter*, 471 U.S. at 233, 105 S.Ct. at 1922.

The court finds that the evidence presented in this case fails to demonstrate the existence of a racially discriminatory purpose behind the Georgia General Assembly's enactment of the 1872 Education Act. The decision of the 1872 Georgia General Assembly to switch the school board selection procedure from election by the people to appointment by the grand jury was not a drastic or invidious departure from the previous procedure used for choosing school board members given the failures of the election procedure. The sequence of events leading up to the passage of the 1872 Education Act show that the public election of county school boards was not a successful method for selecting school board members. The elections were a complex, burdensome process that failed

to achieve its goal of filling all the available school board positions with competent, qualified persons. There was neither a good turnout for the elections nor a great deal of interest in the school board positions which adversely affected the quantity and quality of school board candidates. The problems encountered under the election process made it inevitable that some sort of changes would have to be made. Changing over to the grand jury appointment method, however, did not cause the Georgia General Assembly to depart from, nor relinquish, the goal of preserving and fostering a newly developing public education system in Georgia. Furthermore, appointment by the grand jury was a change that neither Tunis Campbell or any other member of the Georgia General Assembly—black or white, Democrat or Republican—attempted to delete from the statute.

Additional evidence supporting a conclusion that the 1872 Georgia Legislature did not intend to disenfranchise blacks with passage of the 1872 Education Act is the fact that when the same legislature amended the Act in August of 1872, it added language specifically excepting from the grand jury selection provision "those counties in which the election of the County Board of Education is otherwise provided by law." Ga.Laws 1872, p. 64, 67 (Def. exh. III. 8). It is doubtful that a legislature which does away with elections as a means of disenfranchising blacks would turn around and insert an election "loophole" that could be used to defeat the purpose of legislation allegedly designed to deprive blacks of electoral rights.

### III. CONCLUSION

Plaintiffs have shown that the 1872 Education Act was passed during a time when the Georgia General Assembly was controlled by white supremacists who actively sought to deny blacks the right to participate in the political process. That evidence alone, however, does not form a legitimate basis for the court to find that the 1872 Education Act was passed for a racially discriminatory purpose and thereby strike down the grand jury selection process as unconstitutional. To so rule would

effectively give the court unbridled power to strike down any statute passed by Georgia legislatures known to be dominated by white supremacists without giving any consideration to what motivated passage of the particular statute in question.

Plaintiffs have not shown that the Georgia General Assembly's decision to enact the 1872 Education Act was tainted by the racial animus that had infected the 1872 Georgia General Assembly. Plaintiffs, therefore, have failed to carry their burden of demonstrating that racial discrimination was a substantial or motivating factor behind the enactment of the 1872 Education Act. Accordingly, the court hereby RULES that the 1872 Education Act authorizing grand jury selection of county boards of education was not adopted with a racially discriminatory purpose.[6]

SO ORDERED.

---

**6.** By agreement of the parties, the only issue to be addressed in phase one of this trial is whether the 1872 Education Act was passed with a racially discriminatory purpose. Both parties did, however, address in their post-trial briefs the subject of whether passage of the 1872 Education Act violated Section 2 of the Voting Rights Act. In order to establish a violation of Section 2 of the Voting Rights Act, the plaintiffs must first prove discriminatory effect. *Irby v. Fitz-Hugh,* 889 F.2d 1352, 1359 (4th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990). Because the parties did not address the issue of the current discriminatory effect of the 1872 Education Act in phase one of this case, nor were they supposed to, the court finds it inappropriate to issue a ruling on that matter in this order.

The court also notes that although each party asserted that a phase one ruling in their favor would terminate this action, the issue was never conclusively decided. Therefore, the next step in this action is for the parties to brief the court on whether or not the ruling contained in this order brings this case to a close.