**Rosemary S. LOWE, et al., Plaintiffs,**

v.

**KANSAS CITY BOARD OF ELECTION COMMISSIONERS, et al., Defendants.**

No. 90–1041–CV–W–6.

United States District Court, W.D. Missouri, W.D.

Dec. 19, 1990.

Ronald C. Gladney, Bartley, Goffstein, Bollato & Lange, Clayton, Mo., Steven P. Callahan, Humphrey, Farrington & McClain, P.C., Independence, Mo., for plaintiffs.

John H. Kreamer, William L. Turner, Terry J. Brady, E. John Edwards, III, Gage & Tucker, Kansas City, Mo., for intervenors.

Michael D. Fitzgerald, Van Osdol, Magruder, Erickson & Redmond, James M. Smart, Jr., Crews, Smart, Whitehead & Waits, Kansas City, Mo., for defendants.

Dennis J.C. Owens, Law Offices of Dennis Owens, Kansas City, Mo., John C. Scully, Daniel J. Popeo, Washington Legal Foundation, Washington, D.C., for amicus Washington Legal Foundation.

## MEMORANDUM AND ORDER

SACHS, Chief Judge.

Plaintiffs are voters in two councilmanic districts in Kansas City, Missouri, and the incumbent councilmen Hernandez and Hazley. They seek to invalidate a newly-enacted city charter amendment limiting the terms of council members. Intervenors are individual supporters of the amendment and the Committee to Limit Terms, an unincorporated association that sponsored the amendment that won a majority in the November election.

The defendant Board of Election Commissioners has accepted filings for the 1991 city election without reviewing the qualifications of candidates as affected by the amendment, and the Board takes no legal position on the validity of the charter amendment. The Board has obtained leave to join the City of Kansas City as a defendant. Because a majority of the City Council, including the mayor, will be ineligible for reelection if the amendment is valid, the City's position is somewhat in conflict, and a disclaimer has been filed asserting there is no municipal procedure for testing the qualifications of council members. The City contends that a court test is the only method of resolving questions of this nature. For present purposes, however, the court assumes the new City Council would be capable of determining the qualifications of its members. Article II, Section 9, City Charter. In any event, plaintiffs and the Committee to Limit Terms have taken the lead in presenting the contending substantive issues.

A preliminary injunction hearing was held December 4, 1990, at which plaintiffs had an opportunity to present facts in support of their contentions and supporting

legal points.[1] The court has also considered a filing by intervenors on December 12, 1990, an amicus brief filed last week, and plaintiffs' reply filed December 17, 1990. The matter must be decided quickly, in order that this litigation not have a distorting effect on the selection of council members in the two districts in early 1991. The primary election is scheduled for February 26, 1991.

The limitation on council terms to eight consecutive years leaves only four of the twelve council members eligible for reelection. All four are white persons; the disqualified council members, under the amendment, include whites and blacks, as well as an Hispanic member of the Council. The challenge, presented by persons from two districts, asserts that the voters at large have, by the amendment, deprived the minority group voters of those districts of the right to be represented by experienced council members, and council members of their own choice. This is said to violate the Voting Rights Act, 42 U.S.C. § 1973 et seq., the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment.

The Supreme Court has stated that the Act was "aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Board of Elections*, 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1969). "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." 393 U.S. at 569, 89 S.Ct. at 833.[2] Changes considered in *Allen* were from elections by districts to at-large elections, and changes from elective to appointive selection. The *Allen* Court found it unnecessary to consider the purpose or effect of the changes, in light of a procedural defect that is not before the court in this case.

## I.

In the present case plaintiffs principally complain that they are being denied a full opportunity "to elect representatives of their choice." They urge the court to concentrate on the practical effect of the charter amendment. A return to results-oriented analysis is indicated by the current wording of the applicable statutory section, and is confirmed by the Supreme Court. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The simple answer to the plaintiffs' contention is that *all* members of the Kansas City electorate are being deprived of the right to elect council members for more than two consecutive terms, and minority groups are therefore given no "less opportunity than other members of the electorate," as required for a finding of violation of the Act. 42 U.S.C. § 1973(b).

Plaintiffs offer two replies: (1) in its immediate effect, the charter amendment would (if one black member had not decided to run for mayor) restrict the voting rights in three districts with minority concentration and only one district that is primarily a white majority district; and (2) the two plaintiff council members represent impoverished districts, which correlates with minority residence. They contend the need for council manic seniority and know-how in the municipal bureaucracy is much greater in their districts than in more prosperous, primarily white districts, where governmental resources are less needed and the ability to recruit assistance from outside the Council is greater.

■ The first argument is not strongly pressed, although mention is made that the charter amendment would allow reelection of four white council members and no minorities. An incidental and temporary ad-

---

1. Plaintiffs have not briefed or argued the *Dataphase* factors that should be weighed in determining whether they are entitled to a preliminary injunction. *Tullos v. Slattery*, 915 F.2d 1192, 1193 (8th Cir.1990). To expedite the case, they have used their summary judgment filing as authority for relief. The dispositive factor here is likelihood of success, which on the

present showing is quite improbable if not entirely out of the question.

2. The Act prohibits "abridgement" of minority group voting rights, which I believe to be essentially synonymous with a "dilution" of strength, the term used in *Allen*.

verse impact of this nature seems never to have been considered the kind of voting strength dilution or abridgement of rights that falls within the intendment of the Act. On the contrary, disproportionate impact within reasonable bounds does not violate the Act. *Wesley v. Collins*, 605 F.Supp. 802 (M.D.Tenn.1985), *affirmed* 791 F.2d 1255 (6th Cir.1986) (disfranchising felons). *Compare, Hunter v. Underwood*, 471 U.S. 222, 231, 105 S.Ct. 1916, 1921–1922, 85 L.Ed.2d 222 (1985) (admittedly racist use of minor criminal records to disfranchise blacks). *See also* the concurring opinion of Justices Harlan and Stewart in *Hunter v. Erickson*, 393 U.S. 385, 394, 89 S.Ct. 557, 562, 21 L.Ed.2d 616 (1969), where it was said that the "existence of a bicameral legislature or an executive veto may on occasion make it more difficult for minorities to achieve favorable legislation; nevertheless, they may not be attacked on equal protection grounds since they are founded on neutral principles."[3] In the present situation it is only an accident of history that caused the currently less experienced council members to reside in the more prosperous, white First and Fourth Districts, and thus made them eligible for reelection.

■ More seriously pressed is the second contention. Councilmen Hernandez and Hazley have testified, without contradiction, to the special needs of their districts for experienced members of the City Council, in support of the claim that a disproportionate impact will be felt when two-term limitations are imposed there. If legally controlling, this argument would have national application. It would be usable in almost every instance where term limitations are being imposed on legislative bodies elected by districts. The argument has some plausibility, perhaps especially to someone, like myself, who has previously acknowledged to counsel his disapproval of legislative term limitations, as a matter of public policy. It does seem to me that a long-time council member generally has greater potential for effectively meeting the needs of his or her district.[4] I conclude, however, that it would overburden the Voting Rights Act to press it into the kind of service sought by plaintiffs. Any abridgement of the right to vote resulting from the charter amendment is not "on account of race or color," even if it may be claimed to impact most severely on the most needy and impoverished members of society. Though there is a correlation, I cannot believe that Congress meant the Act to protect impoverished or needy groups of voters, irrespective of race, or meant to allow poverty to serve as a racial identifier. The Court which rejected a constitutional claim of discrimination advanced by the more impoverished school districts (*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)) seems most unlikely to stretch the Voting Rights Act in the manner here advocated.

This court would take judicial notice that there are undoubtedly "poor white" districts in this country, if perhaps not in the Kansas City municipal structure. Plaintiffs might concede that persons in those districts could not take advantage of the Voting Rights Act to attack a term limitation proposal. It would be strange to construe the Act to provide relief to minority-dominated districts simply because of the poverty theory, while conceding that poverty affords no grounds for relief unless there is minority dominance.[5]

3. This theory might sustain an at-large system of recalling members of the Council, including those elected by districts. Such a system would be comparable to the charter amendment procedures here in question, and would probably need evaluation based on experience.

4. Career public service does not offend my sense of good public policy, whether such service is in the judiciary, the legislature or in the executive branch, although I recognize strong countervailing considerations applicable to the highest executive officers.

5. In the case at bar, it is not at all certain that there is a minority group majority in the Second District in 1990. Such a majority did not exist in 1980. Therefore, the voters in the Hernandez district may not be in a position to assert the combined minority-group-poverty argument that presents the most appealing and most strongly asserted ground for legal relief. Plaintiffs do not contest application of the amendment to at-large seats on the Council (where district residence is required). Under similar reasoning, it is likely that the amendment would

The court must conclude that the effect of the term limitation amendment cannot alone provide a legal basis, under the Constitution and the Voting Rights Act, for declaring it partially invalid. The charter amendment does not, as a matter of law, dilute or abridge minority group voting strength in a manner that differs from its effect in districts dominated by white voters. All council members of whatever race or national origin will be subject to the two-term limit.

## II.

■ Plaintiffs have alleged, but have not adequately developed, a theory that the campaign organizers and promoters of the charter amendment used "racially motivated and intended tactics" to encourage passage of the amendment. Complaint, ¶ 39. There is no allegation that the electorate was actually or materially influenced by racial appeals, or that the amendment would have failed absent the alleged racial appeals. The evidence supporting the allegation is limited to a single campaign flyer, attached to the memorandum supporting the motion for summary judgment (Exh. B) and introduced into evidence at the hearing.

The flyer contains no direct racial appeal but does include reproduction of newspaper article headings, one brief article and a newspaper cartoon, all tending to be critical of conduct of the present City Council. The article and cartoon do not relate to minority group members of the Council. Six of the numerous story headings (perhaps one in four or five) do refer to Hazley, Councilman Bryant, the black political organization, Freedom, Inc., and Archie Welch, a Freedom officer. A sophisticated voter might recognize some targeting of two black councilmen and the political organization. Councilman Hazley testified that the flyer had not been distributed in black neighborhoods, presumably on the theory that it might be counterproductive there or that black neighborhoods were the recognized center of opposition to the amendment.[6] This is now contested by affidavit, which does not, however, show that distribution was uniform throughout the City. In any event, plaintiffs have not demonstrated that the flyer had heavy circulation, or had any likely effect on the outcome of the election.

The charter amendment carried by a substantial margin, 57% to 43%. Giving plaintiffs the benefit of all doubts, there has been a failure of proof that racist sentiments may have turned the tide in favor of the amendment. To paraphrase a case reviewed by the Supreme Court, it is "pure speculation" that discriminatory intent was exercised by many thousands of Kansas City voters. *Crawford v. Los Angeles Board of Education*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982).

In *Crawford* the Court gave constitutional approval to voter action in California that was far more questionable, as to purpose and effect, than the present charter amendment. The Court found no Fourteenth Amendment violation in a voter-adopted prohibition of busing of pupils for purposes of integration, except as required by the Fourteenth Amendment. Busing to overcome *de facto* segregation was thus forbidden by the voters. Although what was assumed to be a minority group aspiration was thereby thwarted, Justice Powell's opinion noted that many interests other than a desire for racial sanctuary were at stake.

In the present case, the proponents of the charter amendment were riding a wave

also be enforceable in the Sixth District and possibly in the Second, even if legally unenforceable as to Councilman Hazley and the voters in the Third District.

**6.** The term limitation proposal was opposed by a majority of the voters in the Third District, and may well have been opposed by the minority group voters in the Second District. The opposition in those areas did argue that the limitation would be harmful to minorities, and had been proposed by the white "Establishment." Intervenors' Exhs. 1, 2, 3 and 4. Minority group appeals for racial solidarity and opposition do not, of course, demonstrate that majority group approval was racial in nature. It would be naive to assume judicially that campaign charges are necessarily true, or to treat success at the polls as verification of an argument.

of public sentiment against "entrenched" political office-holders, at least in the abstract. Rotation in office is an old concept in American history, although term limitations on legislators is rather novel. It is unnecessary to review the arguments favoring term limitations. Racial impact is surely one of the most obscure aspects of that sentiment, if material at all. In the context of Kansas City government, no one suggests that the City Council is likely to lose minority group membership; the argument emphasized to the court is that experienced minority group council members will be unable to seek reelection.

The plaintiffs' latest brief relies on a theory that the charter amendment was designed to produce "safe" minority representatives, or that it will likely have that effect. It is speculative in my judgment to argue that a limitation of service to eight consecutive years will have any material tendency to reduce the militance of minority representatives on the Council, and even more speculative to claim that a design to reduce the forcefulness of such representatives was part of the hidden agenda of the promoters of the term limitation amendment.[7] I cannot find effective racial motivation in this case that would offer grounds for overturning the vote of the electorate.[8]

For the foregoing reasons plaintiffs' motion for a preliminary injunction forbidding use of the charter amendment to disqualify candidates Hernandez and Hazley will be DENIED. Based on the material presented it is my view that the new City Council, or a State Court, may find them disqualified for another term on the Council, and that such disqualifications would not violate Federal law.

---

7. The reference to "safe" candidates in the Senate Report cited in *Thornburg*, 478 U.S. at 75, 106 S.Ct. at 2779 probably dealt with the predictable behavior of minority group candidates elected at-large or from large districts including a large nonminority voting group. I do not believe such a phenomenon is foreseeable under the charter amendment. As the court has learned in pretrial discovery disputes, an uncompromising attitude frequently signifies inexperience. The charter amendment could thus reduce the numbers of "safe" council members, as that term is used in the Senate Report.

8. Both sides seemingly wished to avoid a historical reference identified by the court, but now apparently adopted by plaintiffs. There was probably no significant term limitation sentiment in Kansas City prior to the income tax misdemeanor charges against Councilman Hazley, which resulted in a short period of impris-

onment. According to the affidavit of the leading black promoter of term limitation, the Citizens Association endorsement of councilmanic term limitations occurred only a few months after the Hazley prosecution in early 1988. It is the court's impression that public sentiment against Hazley's continuation as a member of the Council may have been tinged in some cases by racial feelings. *Compare, Powell v. McCormack*, 395 U.S. 486, 553, 89 S.Ct. 1944, 1980–1981, 23 L.Ed.2d 491 (1969) (Douglas, J., concurring). Both purists and racists were incensed at the time. Before the present proposal was adopted, however, another term limitation proposal had been defeated at the polls. The campaign flyer of which plaintiffs complain makes no reference to the charges against Hazley. Public memory is notoriously short. The matter is noted, but will be discounted.