IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-818

Filed 4 March 2026

Gaston County, No. 20CVS003996-350

NAACP (NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE) GASTON COUNTY BRANCH; NABVETS (NATIONAL ASSOCIATION FOR BLACK VETERANS, INC.) GASTON COUNTY CHAPTER; ETA MU LAMBDA CHAPTER OF ALPHA PHI ALPHA FRATERNITY, INC.; KAREN BRINGLE; GRACIE MOORE; and JOSE TROCHE, Plaintiffs,

v.

GASTON COUNTY, Defendant.

Appeal by plaintiffs from order entered 5 January 2024 by Judge Robert C. Ervin in Superior Court, Gaston County. Heard in the Court of Appeals 20 May 2025.

*Tin, Fulton, Walker & Owen, PLLC, by Gagan Gupta and Abraham Rubert-Schewel and the Paynter Law Firm, PLLC, by Stuart M. Paynter and Cheryl D. Comer, for plaintiffs-appellants.*

*Parker Poe Adams & Bernstein LLP, by Bradley K. Overcash and Emily L. Poe, for defendant-appellee.*

STROUD, Judge.

In 2020, Plaintiffs filed suit for declaratory and injunctive relief to force Gaston County to remove a Confederate monument. The County erected the monument in 1912 outside its courthouse in downtown Gastonia. In 1998, the County moved the monument to its new courthouse, where it stands today. Plaintiffs alleged that the

monument's continued presence violates several provisions of the North Carolina Constitution, including the Open Courts Clause and Equal Protection Clause.[1]

Gaston County moved for summary judgment and sought a declaratory judgment that the Monument Protection Law, N.C. Gen. Stat. § 100-2.1 (2023), prohibits the County from removing the monument.[2]  That law provides that "[a]n object of remembrance located on public property may not be permanently removed" but may be "relocated"—"whether temporarily or permanently"—under limited circumstances.  *Id.* § 100-2.1(b).  The trial court granted summary judgment for the County.  It determined that there were no genuine issues of material fact.  And it ruled that the Monument Protection Law allows removal only under specific statutory conditions—none of which existed here—and that Plaintiffs failed to show any constitutional violation.

---

[1] Plaintiffs also brought claims under the state constitution's public purpose provisions, N.C. Const. art. V, §§ 2(1), 2(7); secession and allegiance clauses, N.C. Const. art. I, §§ 4, 5; and Due Process (Law of the Land) Clause, N.C. Const. art. I, § 19.  They agreed to "drop" their secession and allegiance claim at the summary judgment hearing. They also failed to challenge the trial court's rulings on the public purpose and due process claims, thus abandoning them on appeal.  N.C. R. App. P. 28(a).

[2] In their pleadings and briefs, the parties disputed what to call the Monument Protection Law. Plaintiffs called it the "Patriotism Act," arguing that the term "Monuments Law" was "misleading because of the dearth of textual evidence that the Act applies to courthouse Confederate monuments or to monuments on county property."  "[B]y its own terms," Plaintiffs added, "the Patriotism Act 'does not apply' to monuments posing a threat to public safety."  Gaston County called it the "Monuments Law," noting that the statute's official title is "Protection of monuments, memorials, and works of art" and Chapter 100 is entitled "Monuments, Memorials and Parks."  In *North Carolina State Conference of NAACP v. Alamance County*, this Court referred to the statute as the Monument Protection Law, so we use that term here.  293 N.C. App. 107, 110, 900 S.E.2d 224, 228 (2024) ("[T]he [m]onument was of the type intended to be covered by the General Assembly when it enacted the Monument Protection Law.").

As explained below, Plaintiffs' open courts claim is foreclosed by *North Carolina State Conference of NAACP v. Alamance County*, 293 N.C. App. 107, 900 S.E.2d 224 (2024). There, we held that "the Open Courts Clause does not prohibit the placement of an object of historical remembrance in or around a courthouse." *Id.* at 115, 900 S.E.2d at 230. That holding controls here.

The equal protection claim fails too. Plaintiffs advance two theories: first, that Gaston County's refusal to relocate the monument violates the state Equal Protection Clause; second, that the monument's original construction and placement in 1912 also violates that Clause. The first theory fails under *Alamance County*, which held that a county's intent in declining to move a monument is "irrelevant" when the Monument Protection Law forbids removal. *Id.* at 113, 900 S.E.2d at 229.

Plaintiffs' second theory fails because under our state Equal Protection Clause, a plaintiff must prove both discriminatory intent and "a meaningful disparate impact along racial lines." *Holmes v. Moore*, 384 N.C. 426, 440, 886 S.E.2d 120, 132 (2023). Plaintiffs offered survey data showing that Black residents tend to have more negative feelings about Confederate monuments than White residents. They also submitted expert testimony about potential psychological harm from the monument. But they didn't show that the monument has caused disparate results in judicial outcomes. At the hearing below, Plaintiffs admitted they weren't claiming that "the judges or any [c]ourt officials [we]re acting differently or treating Black residents differently." Plaintiffs' claims rest on negative feelings about historical symbols—

feelings that, however deeply felt, cannot support a legal remedy without evidence of "a meaningful disparate impact along racial lines" on how the judicial system operates. *Id.* We therefore affirm.

## I.    Background[3]

Plaintiffs filed a second amended complaint (complaint) and petitioned for declaratory and injunctive relief in the Superior Court, Gaston County, on 13 October 2021.[4] The complaint detailed the monument's history and alleged multiple state constitutional violations. We recount both below.

### A. Plaintiffs' Allegations

Plaintiffs are three organizations—the Gaston County branch of the National Association for the Advancement of Colored People (NAACP), the Gaston County chapter of the National Association for Black Veterans (NABVETS), the Eta Mu Lambda Chapter of Alpha Phi Alpha Fraternity—and three individuals, all Gaston

---

[3] Because we are reviewing a summary judgment order, our background section comes from the "pleadings," "affidavits," and any other "discovery materials available." *McLennan v. Josey*, 234 N.C. App. 45, 47, 758 S.E.2d 888, 890 (2014) (citation omitted). We view such evidence "in the light most favorable to the non-moving party"—*i.e.*, in Plaintiffs' favor. *Id.*

[4] Plaintiffs filed their initial complaint and petition on 12 November 2020 and an amended complaint and petition on 2 March 2021. At the outset, Plaintiffs named the Gaston County Board of Commissioners and several individual commissioners in their official capacities as Defendants. But at the summary judgment hearing, Plaintiffs voluntarily dismissed the individual commissioners, leaving Gaston County as the lone Defendant.

County residents and taxpayers. The complaint specifically alleges that one individual Plaintiff is White, one is Black, and one is Hispanic.[5]

Plaintiffs alleged that the monument at issue—"a multi-story structure guarding the main entrance to the Gaston County courthouse"—"valorizes an era of slavery, secession, and white supremacy." In 1912, Gaston County erected the monument outside its "historic courthouse in downtown Gastonia." It stayed there until 1998, when county officials moved it to the new courthouse's entrance on Dr. Martin Luther King Way, near the Gaston County Board of Commissioners' (Board) meeting place, the Social Services Division, the Battered Women's Residence and Resource Center, and the Sheriff's office.

The monument displays a "bas-relief of the Confederate flag, waving from a broken pole"; the initials "CSA"; and a thirty-five-foot armed Confederate soldier "as he went forth to battle." It also includes inscribed plaques that read "CONFEDERATE HEROES" and "THE NOBLE SERVICE OF THE SONS OF GASTON COUNTY IS OUR PERPETUAL HERITAGE." At the monument's 1912 dedication ceremony, the keynote speaker "praise[d] white supremacy," "criticize[d] the right of Black men to vote," and declared that North Carolina held "the purest Anglo-Saxon blood to be found on American shores." According to the complaint, Gaston County officials appreciate this history: The director of the Gaston County

---

[5] According to the complaint, approximately 18% of Gaston County residents are Black. The complaint doesn't identify the remaining 82%'s racial composition.

Museum of Art & History stated that "the belief in white supremacy is interwoven into the history of this monument, from its conception. It cannot be separated and can only be acknowledged."

Plaintiffs' complaint traced the development of our State's "[p]ost-Civil War Constitution." After the Civil War ended, North Carolina adopted a constitution in 1868 that outlawed slavery, declared "all men are created equal," and "offer[ed] absolute and permanent fealty to the re-united Nation." The current state constitution, "effective as of 1971," added a provision "explicitly guaranteeing equal protection as a matter of law": "No person shall be denied the equal protection of the laws; nor shall any be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. "Despite these guarantees," Plaintiffs alleged, Gaston County erected the monument "as a symbol of white supremacy and a glorification of the secessionist South."

Plaintiffs asserted that the monument inflicts ongoing harm. Citing community statements "reported by media outlets," they described the monument as continuing "to cause [r]acialized [p]ain [t]oday." One "activist" said that it sends the message "we're still in control here." A Black Army veteran stated: "These [monuments] send a message and it's not a message of justice." The Gaston County NAACP President called it "a symbol of hate" with "no place on the courthouse grounds, where individuals go looking to seek equal, fair justice."

Plaintiffs further maintained that the monument posed a public safety threat.[6] It has "been the catalyst for protests and counter protests," requiring Gaston County to spend over $50,000 on fencing and security. County Commissioner Ronnie Worley said that the County was "not even defending a lawsuit—it [wa]s defending a statue, protecting people, and putting its officers in continual harm's way." Commissioner Bob Hovis stated that if the County was spending money to protect the monument, "fear and concern for the monument's safety already exists."

These concerns came to a head in August 2020, about six months before Plaintiffs filed their initial complaint. Plaintiffs alleged that, "[i]n the aftermath of the killing of George Floyd," the Board voted six-to-one to transfer the monument to the Sons of Confederate Veterans for relocation to private property. The Board entered a resolution documenting its decision; the resolution cited North Carolina General Statute Section 160A-279, which authorizes counties to "convey by private sale" to "any public or private entity which carries out a public purpose . . . any real or personal property which it owns[,]" despite "any other provision of law." N.C. Gen. Stat. § 160A-279(a), (b) (2023). Three weeks later, the Board reversed course after the Sons of Confederate Veterans "refused to sign the deed, thereby refusing to accept legal ownership of the [m]onument, effectively [and] rendering" the transfer

---

[6] The complaint includes photos of the monument and groups of people near it; several photos are credited to people on Facebook. The complaint doesn't describe what many of the photos depict or when they were taken.

- 7 -

resolution "moot." The Board's rescission resolution, Plaintiffs noted, said nothing about a state law prohibiting the monument's removal.

Plaintiffs' complaint also pointed to other North Carolina counties' actions. They alleged that other counties—including Anson, Buncombe, Davidson, Pitt, Nash, and Vance County—had removed Confederate monuments "consistent with the directive of North Carolina Governor Roy Cooper." They cited statutes supporting the monument's removal, including Section 160A-279 and North Carolina General Statute Section 153A-140, which grants counties "authority" to "remove, abate, or remedy everything that is dangerous or prejudicial to the public health or safety." And they invoked the Monument Protection Law's public safety exception. *See* N.C. Gen. Stat. § 100-2.1(c)(3) (stating that "this section does not apply" to monuments "for which a building inspector . . . has determined poses a threat to public safety because of an unsafe or dangerous condition"). Plaintiffs quoted an advisory letter from Chief Deputy Attorney General Alexander Peters saying that the statute "does not purport to specify or limit what conditions may be considered 'unsafe or dangerous.' "

Finally, the complaint includes several "causes of action." Counts one and two, which were "[b]rought by [the] Black Plaintiffs [a]gainst [a]ll Defendants," alleged that the monument violated the North Carolina Constitution's Equal Protection

Clause and Anti-Race Discrimination Provision.[7] N.C. Const. art. I, § 19. Counts two through six, which were "[b]rought by [a]ll Plaintiffs [a]gainst [a]ll Defendants," alleged that the monument violated various other state constitution provisions: (1) the prohibition against misuse of taxpayer money for unconstitutional purposes, N.C. Const. art. V, § 2; (2) the anti-secession and allegiance-to-the-United-States provisions, N.C. Const. art. I, §§ 4, 5; (3) the Law of the Land Clause, N.C. Const. art. I, § 19; and (4) the Open Courts Clause, N.C. Const. art. I, § 18. Plaintiffs also sought a declaratory judgment that Gaston County was "estopped" from arguing that the monument's removal "violate[d] state law" and that any state law, "as applied to prevent the removal of [this] . . . monument," was unconstitutional.

Plaintiffs requested that the court enter an order declaring that: (1) "the monument violates one or more provisions of the North Carolina Constitution," (2) Gaston County is "estopped (or quasi[-]estopped) from maintaining that the [Monument Protection Law] prohibits the [monument's] removal," and (3) the Monument Protection Law "as applied to the [monument] is unconstitutional to the extent it could be found to preclude removal." They also asked the court to enter an order holding that "the monument violates one or more provisions of the North

---

[7] The complaint identifies only one individual Plaintiff as Black. Its reference to "Black Plaintiffs" (plural) appears to include the organizational Plaintiffs' Black members. The complaint alleged: "All individual Plaintiffs and many members of the organizational Plaintiffs suffer personal and direct effects from the statue. . . . The Black Plaintiffs are particularly vulnerable to harms caused by white supremacists attracted to the monument."

Carolina Constitution . . . and granting injunctive relief requiring" Gaston County to "remove the monument and prohibiting its placement on any other public property."

## B. Proceedings Below

On 17 November 2021, Gaston County moved to dismiss, or alternatively, to transfer the case to a three-judge panel. It argued that it lacked authority to remove the monument under the Monument Protection Law and that Plaintiffs' claims amounted to a facial challenge to that statute.[8] As noted earlier, the Monument Protection Law states that "[a]n object of remembrance located on public property may not be permanently removed" but may be "relocated"—"whether temporarily or permanently"—under limited circumstances. N.C. Gen. Stat. § 100-2.1(b). The law has a "public safety" exception: It "does not apply" when "a building inspector or similar official has determined [the monument] poses a threat to public safety because of an unsafe or dangerous condition." *Id.* § 100-2.1(c)(3). The trial court denied the motion to dismiss and stated that the "motion to transfer [wa]s rendered moot and therefore denied."

---

[8] To support transfer to a three-judge panel, Gaston County relied on North Carolina General Statute Sections 1-267.1(a1) and 1-81.1(a1). Section 1-267.1(a1), at that time, stated that "any facial challenge to the validity of an act of the General Assembly shall be transferred . . . to the Superior Court of Wake County and shall be heard and determined by a three-judge panel of the Superior Court of Wake County." N.C. Gen. Stat. § 1-267.1(a1) (2023). That provision has since been repealed. *See* An Act to Make Base Budget Appropriations for Current Operations of State Agencies, Departments, and Institutions, S.L. 2023-134, § 16.21(a1), 2023 N.C. Sess. Laws 760, 1168-69. Section 1-81.1(a1) provides that "[v]enue lies exclusively with the Wake County Superior Court" for "any claim seeking an order or judgment of a court . . . to restrain the enforcement, operation, or execution of an act of the General Assembly, in whole or in part, based upon an allegation that the act . . . is facially invalid" for "violat[ing] the North Carolina Constitution or federal law." N.C. Gen. Stat. § 1-81.1(a1) (2023).

Gaston County later filed an answer, denying most of Plaintiffs' allegations. It also requested injunctive relief and a declaratory judgment that it had "complied with any and all" laws and that the monument could not be "removed, relocated, [or] altered in any way" under the Monument Protection Law. On 13 October 2023, Gaston County moved for summary judgment, again claiming that the Monument Protection Law prevented the monument's removal. In doing so, the County relied on "the pleadings, the written discovery, depositions, and other matters of record in this action, including [its] brief and materials." Plaintiffs, in response, submitted a brief, a study, affidavits, declarations, news articles, and other information in opposition to the motion; Gaston County submitted no additional evidence in rebuttal.

After a hearing at the Gaston County Courthouse, the trial court granted summary judgment for Gaston County on 5 January 2024. It did not, however, grant the declaratory relief the County had requested. The court rejected Gaston County's claim that Section 100-2.1 wholly prevented removal; the statute has exceptions—"at least[ ] four" permitting relocation and "two" allowing removal.[9] In the court's view, several exceptions were "potentially applicable" to the monument "pending further developments." So to declare that Section 100-2.1 wholly "preclude[d]" the

---

[9] The court later opined that the Monument Protection Law contains "at least eight exceptions" to the "prohibition o[n] removal or relocation."

monument's removal would have required the court "to act as an ostrich and bury its head in the sand to pretend that" the statute's exceptions "d[id] not exist."

The court then addressed and rejected Plaintiffs' constitutional claims. On appeal, Plaintiffs challenge the court's ruling on two provisions: the Open Courts Clause and Equal Protection Clause.

On the open courts claim, the trial court explained that the provision serves two functions: guaranteeing those who suffer injury the right to seek redress, and protecting "the institutional integrity of our state courts by constitutionally guaranteeing that justice is administered openly in public," *DTH Pub. Corp. v. U.N.C. at Chapel Hill*, 128 N.C. App. 534, 496 S.E.2d 8 (1998). The monument violated neither function. Plaintiffs had "an opportunity to pursue their claims" despite the monument's presence. And the hearing was "held in open court" with proceedings "open to the public and the media."

As for the equal protection claim, the trial court applied *Holmes v. Moore*, 384 N.C. at 426, 886 S.E.2d at 120. Under *Holmes*, a plaintiff bringing an equal protection challenge under our state constitution must show both "discriminatory intent" and that the government action "actually produces a meaningful disparate impact along racial lines." *Id.* at 440, 886 S.E.2d at 132. The court found that Plaintiffs had "offer[ed] abundant evidence" that the monument reflects Gaston County's "discriminatory purpose." But Plaintiffs failed to show a meaningful disparate impact from the County's maintenance of the monument. So the trial court concluded

that the monument's presence did not violate the state Equal Protection Clause.

Plaintiffs timely appealed.[10]

## II. Analysis

Plaintiffs argue that the trial court erred in granting summary judgment for two reasons. First, the trial court "failed to consider" their evidence that the monument's presence "create[s] the appearance of racial bias," thus violating the Open Courts Clause. Second, the trial court failed to evaluate whether the monument violates our state Equal Protection Clause by causing "significant adverse impacts to Gaston County's Black residents, but not . . . its White residents."

Gaston County responds that the trial court properly granted summary judgment. In its view, Plaintiffs "failed to present sufficient evidence" of an Open Courts Clause violation. And the trial court could not have found that Gaston County violated our state Equal Protection Clause by "not removing or relocating the [m]onument" because the Monument Protection Law "prohibit[s]" such action.

### A. Standard of Review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a

---

[10] Although part of the trial court's order denied Gaston County's request seeking a declaratory judgment that it was prohibited from moving the monument, Gaston County did not cross-appeal that ruling.

judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023). The movant bears "the burden of clearly establishing" that no "triable issue of fact" exists. *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975) (citation and quotation marks omitted). We "carefully scrutinize[ ]" the movant's papers, while "indulgently regard[ing]" those of the nonmovant. *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citation omitted). "All facts asserted by the" nonmovant "are taken as true," and "their inferences must be viewed in the light most favorable to that party." *Id.* And "even if the trial court's rationale . . . was wrong," we affirm summary judgment if it "can be sustained on any grounds." *Hindman v. Appalachian State Univ.*, 219 N.C. App. 527, 529, 723 S.E.2d 579, 580 (2012).

This Court reviews a trial court's summary judgment order *de novo*—that means we consider the matter "anew" and "freely substitute[ ]" our "own judgment for that of the lower courts." *Moseley v. Hendricks*, 388 N.C. 128, 135, 918 S.E.2d 843, 848 (2025) (citation omitted). Constitutional questions also receive *de novo* review. *State v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016).

Before turning to the merits, we make two preliminary observations. First, the trial court's order includes 136 numbered paragraphs described as "undisputed findings of fact" and "conclusions or law." As the order correctly notes, "findings of fact and conclusions of law are not necessary in an order determining a motion for summary judgment." *See White v. Town of Emerald Isle*, 82 N.C. App. 392, 398, 346 S.E.2d 176, 179 (1986) ("A trial judge is not required to make finding[s] of fact and

conclusions of law in determining a motion for summary judgment, and if he does . . . they are disregarded on appeal." (citations omitted)). And when such an order does include findings of fact, "they are disregarded on appeal." *Id.* The court understood as much, stating that any facts recited in its order were "not at issue." And at the summary judgment hearing, both parties agreed that no genuine issues of material fact existed.

On appeal, though, Plaintiffs assert that "facts matter and ignoring the facts does not make them go away." In their view, the case should be remanded for trial to determine the facts. At the same time, they claim no genuine issues of material fact exist because Gaston County offered no evidence to rebut their affidavits. Plaintiffs' brief never addresses the court's "findings of fact" or disputes the court's characterization of them as merely reciting facts "not at issue." Still, because we disregard the court's findings and review the summary judgment order *de novo* anyway, Plaintiffs' omission is consistent with our standard of review.

Second, the evidentiary record is one-sided, but this does not affect our review. We must accept the non-moving party's forecast of evidence as true when reviewing a summary judgment order. *See Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. Gaston County didn't cross-appeal the trial court's denial of its request for a ruling that the Monument Protection Law prohibits relocation. Nor did it argue on appeal that any of the trial court's findings were incorrect. And although the County prevailed below, it offered no evidence directly addressing Plaintiffs' showing of discriminatory intent.

At the summary judgment hearing, Gaston County *argued* that the monument serves valid historical purposes—"commemorat[ing] an event that was part of North Carolina's history" and "honor[ing] . . . Gaston County's history." But arguments are not evidence. *See State v. Collins*, 345 N.C. 170, 173, 478 S.E.2d 191, 193 (1996) ("[I]t is axiomatic that the arguments of counsel are not evidence.").

Despite this one-sided record, Plaintiffs insist on appeal that the trial court "entirely failed to engage with [their] evidence" showing that the monument's placement "conveys a racially disparaging message" that makes Black residents "question whether Black people, and other people of color, will receive justice" in the courthouse. But the trial court did engage with Plaintiffs' evidence about the monument's intent and effect. The court summarized it extensively—sometimes in Plaintiffs' own words—and made findings including:

> 133. Gaston County has inscribed the words "In God We Trust" into the stone over the entrance to its courthouse to communicate a message concerning its values.

> 134. [Plaintiffs] perceived that Gaston County and its Board . . . have implicitly and effectively inscribed the words "In White Supremacy We Trust" into the stonework over the entrance by refusing to remove the Confederate Heroes [monument] from the entrance to that same courthouse.

It's unclear what this "fail[ure] to engage" means. In any event, both parties argue that the court's ruling was either correct or incorrect as a matter of law. So we address their legal arguments, taking Plaintiffs' evidence as true and disregarding

the court's findings of fact. *See White*, 82 N.C. App. at 398, 346 S.E.2d at 179.

## B. Open Courts Clause

Plaintiffs argue that the trial court erred in rejecting their open courts claim by requiring proof of a physical barrier to courthouse access. The monument, they contend, creates a psychological barrier that achieves the same result and violates the same constitutional right. And according to Plaintiffs, North Carolina law recognizes that "the *appearance* of fair proceedings" matters just as much "as the fact of fair proceedings." *See State v. Mettrick*, 305 N.C. 383, 385, 289 S.E.2d 354, 356 (1982). The judicial system must not only operate evenhandedly but also "be *perceived* to" do so. *State v. Cofield*, 320 N.C. 297, 302, 357 S.E.2d 622, 625 (1987) (*Cofield I*). Plaintiffs presented "evidence showing that the . . . [m]onument's placement 'conveys a racially disparaging message'" and "makes Black Gaston County residents 'question whether Black people, and other people of color, will receive justice'" in the courthouse. That evidence, they say, demonstrates the monument "interferes with the public's right to access the courts and for justice to 'be administered without favor, denial, or delay.'" N.C. Const. art. I, § 18. We disagree.

The North Carolina Constitution declares that "[a]ll courts shall be open; . . . and right and justice shall be administered without favor, denial, or delay." *Id.*[11]

---

[11] Article I, Section 18 also guarantees that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." N.C. Const. art. I, § 18. But that right is not at issue here.

Although added to our state constitution in 1868, N.C. Const. of 1868, art. I, § 35, this provision "traces its pedigree" to the Magna Carta—to King John's "promise to his rebellious barons" that "[t]o no one will we sell, to no one will we deny or delay right or justice." John V. Orth and Paul Martin Newby, *The North Carolina State Constitution* 65 (2d ed. 2013) [*State Constitution*]; *see also Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 603, 853 S.E.2d 698, 730 (2021) ("[Article I, Section 18] "has ancient roots in English and American law.").

An "open" court, as originally understood, meant "not that the judges would sit round-the-clock or that every spectator would always be welcome" but that "legal remedies would not be withheld." *State Constitution* at 65-66. "Justice would be available to all who were injured" through "a system of courts, staffed by professional judges." *Id.* at 65. Simply put, "the core meaning of ["open" in] this section [wa]s that properly qualified courts shall be regularly in session." *Id.* at 66.

Our precedents have expanded that core meaning—but only so far. The Supreme Court, for example, has held that Article I, Section 18 "guarantees a criminal defendant a speedy trial, an impartial tribunal, and access to the court to apply for redress of injury." *Simeon v. Hardin*, 339 N.C. 358, 378, 451 S.E.2d 858, 871 (1994). It has declared that, under the Open Courts Clause, "[t]he trial and disposition of criminal cases is the public's business and ought to be conducted in public in open court." *In re Edens*, 290 N.C. 299, 306, 226 S.E.2d 5, 9 (1976). And it has explained that the provision "guarantees a qualified constitutional right on the

part of the public to attend civil court proceedings." *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 476, 515 S.E.2d 675, 693 (1999).

All these cases concern access to or observation of judicial proceedings themselves—whether criminal defendants can obtain speedy trials, whether parties can seek redress for injuries, whether the public can attend and observe hearings. None extends the Open Courts Clause to governmental action (or inaction) outside those proceedings—and here, literally outside the court building itself—that might affect how people perceive the judicial system.

We recently applied this understanding of the Open Courts Clause in a nearly identical case. *See Alamance Cnty.*, 293 N.C. App. at 107, 900 S.E.2d at 224. In *Alamance County*, civil rights organizations challenged a Confederate monument's placement outside the Alamance County Courthouse. 293 N.C. App. at 109, 900 S.E.2d at 227. The plaintiffs argued that the monument's presence violated the Open Courts Clause because it conveyed "the appearance of judicial prejudice" and "broadcast[ed] officially sanctioned racial degradation." *Id.* at 114-15, 900 S.E.2d at 230.

This Court rejected that argument. The Open Courts Clause, we said, "does not prohibit the placement of an object of historical remembrance in or around a courthouse." *Id.* at 115, 900 S.E.2d at 230. The plaintiffs had "failed to show they [we]re denied the Clause's guarantees": They did not assert that the courthouse was "not regularly in session or that legal remedies are being withheld," nor did they

contend that "trials [we]re closed to the public or that criminal defendants [we]re [being] denied speedy trials." *Id.* Without such a showing, the county had not violated the Open Courts Clause. *Id.*

Our decision in *Alamance County* controls here. There, as here, the plaintiffs argued that a Confederate monument owned and maintained by the county and standing outside a county courthouse conveyed a "racially disparaging message" that made Black residents question whether they would "receive justice within the courthouse." *See id.* at 114, 900 S.E.2d. at 230. There, as here, the plaintiffs claimed that the monument "cast doubt on the legitimacy of the court system in the eyes of Black citizens." *See id.* And there, as here, the plaintiffs could not show that the courthouse failed to remain regularly in session, legal remedies were being withheld, trials were closed to the public, or criminal defendants were denied speedy trials. *See id.* at 115, 900 S.E.2d at 230. *Alamance County* forecloses Plaintiffs' open courts claim.

But Plaintiffs offer two reasons why that decision should not resolve this case.

First, they argue that *Alamance County* did not address cases "recognizing the importance of public perception of the judiciary and the necessity that citizens believe the judicial system functions openly and fairly." They cite *Mettrick*, 305 N.C. at 383, 289 S.E.2d at 354, and *Cofield I*, 320 N.C. at 297, 357 S.E.2d at 622. But these cases don't support their open courts claim. Both address different constitutional rights in distinct factual situations. And neither mentions the Open Courts Clause.

From *Mettrick*, Plaintiffs cite the Court's statement that "the appearance of a fair trial before an impartial jury is as important as the fact of such a trial." *Mettrick*, 305 N.C. at 385, 289 S.E.2d at 356. This statement is true, but Plaintiffs wrench it from its context.

In *Mettrick*, the defendants were on trial for transporting "5,000 to 10,000 pounds of marijuana." *Id.* at 384, 289 S.E.2d at 355. The court had ordered "that a special venire of jurors be drawn from another county." *Id.* So on the first day of trial, a sheriff and one of his deputies "transported the prospective jurors in two activity buses" from their home county to the courthouse. *Id.* The deputy "also transported the jurors to lunch" and back home. *Id.* Jury selection finished that day. *Id.* On the second day, the sheriff transported eleven of the fourteen selected jurors and alternates to the courthouse. *Id.* At that point, the court "learned for the first time" that these two State witnesses—the sheriff and deputy—"had been transporting the jury." *Id.* The defendants moved for a mistrial, which the court denied. *Id.* During trial, the sheriff testified five times and the deputy testified three times. *Id.*

Our Supreme Court held that the trial court erred in denying the motion:

> [W]here a witness for the State acts as a custodian or officer in charge of the jury in a criminal case, prejudice is conclusively presumed. . . . In such cases the appearance of a fair trial before an impartial jury is as important as the fact of such a trial. The integrity of our system of trial by jury is at stake. No matter how circumspect officers who are to be witnesses for the State may be when they act as

> custodians or officers in charge of the jury in a criminal
> case, cynical minds often will leap to the conclusion that
> the jury has been prejudiced or tampered with in some way.
> If allowed to go unabated, such suspicion would seriously
> erode confidence in our jury system.

*Id.* at 385, 289 S.E.2d at 356 (internal citations omitted).

*Mettrick* thus concerned the right to an impartial jury, not the Open Courts Clause. *Id.* And it involved an issue specific to the defendants' trial: State witnesses transporting and supervising jurors during trial. *Id.* The Court applied an appearance-of-fairness principle because allowing State witnesses to supervise jurors would "seriously erode confidence in our jury system"—even if no actual tampering occurred. *Id.*

From *Cofield*, Plaintiffs rely on the Court's statement that the judicial system "must operate evenhandedly" and "must also be *perceived* to operate evenhandedly." *Cofield I*, 320 N.C. at 302, 357 S.E.2d at 625. Also true—but Plaintiffs (again) strip this statement from its context.

In *Cofield*, the defendant brought an equal protection challenge against Northampton County's "racially discriminatory process [for] selecting grand jury foremen." *Id.* at 300, 357 S.E.2d at 624. His evidence showed that although roughly 61% of the county's population was Black, "only one [B]lack person had served as grand jury foreman" between 1960 and 1984. *Id.* at 299, 357 S.E.2d at 624. The Court held that discriminatory selection of a grand jury foreman violates Article I, Sections 19 and 26 of the North Carolina Constitution. *Id.* at 301, 357 S.E.2d at 625.

- 22 -

Section 26 bars exclusion from "jury service on account of sex, race, color, religion, or national origin." N.C. Const. art. I, § 26. But that provision, the Court observed, "does more than protect individuals from unequal treatment"—it declares that North Carolina "will not tolerate the corruption of [its] juries by racism, sexism and similar forms of irrational prejudice." *Cofield I*, 320 N.C. at 302, 357 S.E.2d at 625.

From there, the Court articulated its appearance-of-fairness principle: "[T]he judicial system of a democratic society must operate evenhandedly if it is to command the respect and support of those subject to its jurisdiction. It must also be *perceived* to operate evenhandedly." *Id.* Perception matters, the Court reasoned, because "[r]acial discrimination in the selection of grand and petit jurors" robs "both an aggrieved defendant and other members of his race of the perception that he has received equal treatment at the bar of justice," thereby "undermin[ing] the judicial process." *Id.* The Court remanded to let the State "rebut [the] defendant's prima facie showing" of discrimination. *Id.* at 309, 357 S.E.2d at 629. When the case returned, the Court in *Cofield II* found "not the slightest hint of racial motivation" in the trial judge's selection of the grand jury foreman but concluded "the selection process . . . was not racially neutral because it excluded from consideration as foreman all of the [B]lack grand jury members." *State v. Cofield*, 324 N.C. 452, 459-60, 379 S.E.2d 834, 839 (1989) (*Cofield II*).

*Cofield I* likewise addressed a different constitutional right—the prohibition on racial discrimination in jury selection, not the Open Courts Clause. *Cofield I*, 320

N.C. at 302, 357 S.E.2d at 625.  And it too involved an issue specific to the defendant's case: discriminatory selection of the grand jury foreman for his indictment.  *Id.*  The Court applied an appearance-of-fairness principle because discriminatory jury selection "undermines the judicial process" by depriving defendants and their racial communities "of the perception" of equal treatment.  *Id.*

In short, both cases applied appearance-of-fairness principles to jury proceedings—and only to problems within the defendants' own cases.  In jury proceedings, appearance matters because jurors decide guilt or innocence.  When the decision-makers themselves might be biased, the entire verdict is suspect.  Here, Plaintiffs have not shown how a monument—even one offensive to many people—outside a courthouse has affected any decision-maker, judge or jury, deciding cases inside.

The Open Courts Clause guarantees access to functioning courts through verifiable, objective conditions: Are courts in session?  Are trials public?  Are criminal defendants receiving speedy trials?  Are remedies available?  *See Alamance Cnty.*, 293 N.C. App. at 115, 900 S.E.2d at 230.  These questions turn on observable facts— not subjective feelings or perceptions.  *Mettrick* and *Cofield I*'s reasoning doesn't extend to this context.

Next, Plaintiffs believe this case differs from *Alamance County* because the trial court found that the monument "was built and placed in front of the courthouse" to "intimidat[e] Black residents and deter[ ] them" from enjoying their constitutional

rights.[12] They cite the court's finding that "[P]laintiffs offer[ed] abundant evidence in support of their effort to show that the presence of the [monument] evidences a discriminatory purpose" on Gaston County's part.

Again, we disregard those findings on appeal from summary judgment. *See White*, 82 N.C. App. at 398, 346 S.E.2d at 179 (citations omitted). And taking Plaintiffs' forecasted evidence as true, we assume the monument "was built and placed in front of the courthouse" to "intimidat[e] Black residents and deter[ ] them" from enjoying their constitutional rights. Even so, Plaintiffs have not established an Open Courts Clause violation.

Open courts violations turn on whether courts remain accessible and functioning—not on discriminatory intent by someone outside the judicial system. Plaintiffs presented no evidence that the County's intent in 1912 (or its 1998 relocation decision), however reprehensible, has affected the courthouse's accessibility or operations today. As the trial court noted, the hearing in this very case took place in that courthouse. Gaston County's discriminatory intent behind the monument's placement doesn't create an open courts violation.

Plaintiffs also maintain that psychological barriers to courthouse access deserve the same treatment as physical ones. The monument, they say, creates a barrier as real as a locked door—signaling to Black residents the courts are not truly

---

[12] As noted earlier, the trial court explained: "[T]o the extent that this order finds or recites facts, it is the [c]ourt's determination that these facts are not at issue."

"open" to them. We don't doubt that some people may experience real "psychological barriers" related to many places or activities for many reasons. But physical and psychological barriers are not the same under the Open Courts Clause. Again, that provision protects against actual denial of access to functioning courts, not subjective beliefs or feelings that might discourage some hypothetical person's entry. Plaintiffs' theory would expand the Open Courts Clause from a guarantee of operational access into a mandate over government speech, facilities, and their potential psychological effects on how residents perceive the judiciary. Nothing in our state's constitution's text, history, or precedent supports that expansion.

At the summary judgment hearing, Plaintiffs acknowledged that they were asking for "a bit of an extension of the current law." But this would not be "a bit of an extension"—it's a major one with no basis in law. Under *Alamance County*, the monument's presence outside the courthouse doesn't violate the Open Courts Clause, no matter how deplorable the intent behind it.

## A. Equal Protection Clause

Plaintiffs argue that the trial court erred in rejecting their equal protection claim by focusing on the wrong actor's intent.[13] The court found that Plaintiffs'

---

[13] Plaintiffs claim that the trial court erred in granting summary judgment "given the existence of genuine disputes of fact." They ask us to remand so the trial court can "weigh . . . the competing evidence regarding whether Black citizens experience disproportionately negative impacts" from the monument's location. But Plaintiffs never identify any genuinely disputed facts—much less material ones. Beyond two passing references, they devote their brief to challenging the trial court's equal

evidence showed that the monument's "presence . . . evidences a discriminatory purpose on the part of Gaston County." But the court then asked whether Plaintiffs had shown that the *state court system* acted with discriminatory intent in "building and preserving" the monument. Plaintiffs contend the trial court should have focused on whether *Gaston County's* "construction and placement" of the monument and "refus[al] to relocate" it violate their equal protection rights under the state constitution. They also claim that the court needed to "evaluate whether Plaintiffs . . . showed that Gaston County's actions resulted in a meaningful disparate impact along racial lines."

We agree with Plaintiffs that responsibility for operating our courts cannot be neatly assigned entirely to the State or the County. Gaston County owns and maintains the monument, but it also has an obligation to provide and maintain court facilities. N.C. Gen. Stat. § 7A-302 (2023). And the State, through the Administrative Office of the Courts, administers the court proceedings conducted inside the county-owned courthouses. *See* N.C. Gen. Stat. § 7A-343 (2023). Judges, clerks, prosecutors, public defenders, and many others cannot do their work without a court facility. And a county's failure to fulfill its obligation to provide and maintain court facilities could potentially impair the court system's operations. Given this

---

protection analysis. So again, we address only whether the trial court correctly concluded that Gaston County was "entitled to [summary] judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023).

intertwined responsibility, the trial court reasonably examined whether the monument impaired court operations specifically.

And that focus was appropriate given Plaintiffs' submissions in opposition to the summary judgment motion. In their complaint, Plaintiffs asserted that the monument affected more than the courts—including "[o]ther key government services" like "the Social Services Division, the County's Battered Women's Residence and Resource Center, and the Sheriff's office." Yet in the affidavits and other information submitted to oppose summary judgment, Plaintiffs focused only on adverse impacts related to the courthouse and court proceedings. For example, Dr. Blackshear's affidavit discusses the psychological harm caused by the monument and connects this to its potential effect on Black people's access to the courts. He concluded:

> Based on my experience in clinical psychology, and my understanding that individuals often avoid spaces in which they know they are likely to experience psychological harm, it is my opinion that potential Black American court participants may attempt to avoid participation in court (such as jury service) rather than remain in a courthouse committed to honoring Jim Crow era values of racism and white supremacy, as evidenced by the imposing Confederate monument at the entrance.

He did not mention whether Black people may also be deterred from accessing other buildings or services near the monument that were alleged in the complaint. So again, the trial court's focus on how the monument affects court operations was appropriate based on Plaintiffs' complaint and the evidence they submitted in

opposition to summary judgment.[14]  We now turn to the merits.

The North Carolina Constitution provides that "[n]o person shall be denied the equal protection of the laws."  N.C. Const. art. I, § 19.  That clause "requires that all persons similarly situated be treated alike."  *Richardson v. N.C. Dep't of Correction*, 345 N.C. 128, 134, 478 S.E.2d 501, 505 (1996) (citing *Plyler v. Doe,* 457 U.S. 202, 216 (1982)).  "Unlike most other provisions in Article I, which 'may be traced back through this [S]tate's 1868 constitution to its Revolutionary Constitution of 1776,' the Equal Protection Clause . . . did not become part of our fundamental law until 1971, when the current state constitution went into effect."  *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 214, 886 S.E.2d 16, 33 (2023) (quoting *State Constitution* at 45).  The drafters "based their work on the [Fourteenth Amendment's] Equal Protection Clause."  *Id.* (citation omitted).  So our courts have "generally follow[ed]" the United States Supreme Court's analysis "in interpreting the corresponding federal clause."  *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009).

---

[14] The only specific mention in Plaintiffs' evidence submitted in opposition to summary judgment of "the area around the [m]onument" comes from Chris Thomason's declaration.  He stated that the area

> is well-trafficked and serves as an important center of civic life because it houses the [c]ourthouse, jailhouse, and the Gaston County Department of Social Services. In addition to litigation, a variety of activities and civil business occur in or near the Courthouse (e.g., requesting a birth certificate, applying for government assistance, completing a background check, etc.). No one can enter any building in this area without confronting the [m]onument.

Although the monument made him feel disappointed, hopeless, and helpless and caused him pain and anger, he did not say that these negative feelings prevented him from attending events in or near the courthouse.

Our Supreme Court has held—like the United States Supreme Court—that constitutional "protection against unreasonable discrimination under color of law is not limited to the enactment of legislation." *S. S. Kresge Co. v. Davis*, 277 N.C. 654, 660, 178 S.E.2d 382, 385 (1971). That protection extends to "the administration and the execution of laws valid on their face" and to other neutral government action. *Id.* at 660, 178 S.E.2d at 385-86 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). The government must not act "so as invidiously to discriminate on the basis of race." *Holmes*, 384 N.C. at 438, 886 S.E.2d at 130 (quoting *Washington v. Davis*, 426 U.S. 229, 241 (1976)). Or as our Supreme Court recently put it: Even "apparently race-neutral" government action "can violate equal protection if" taken with "a racially discriminatory purpose." *Moore*, 384 N.C. at 215, 886 S.E.2d at 34 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

But neutral government action that results in "unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Davis*, 277 N.C. at 662, 178 S.E.2d at 386 (quoting *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)). Discriminatory intent, however, is not enough. Plaintiffs "must also demonstrate that the challenged law actually 'produces disproportionate effects along racial lines.'" *Holmes*, 384 N.C. at 453, 886 S.E.2d at 140 (citation omitted).

Plaintiffs challenge two distinct government actions: Gaston County's "refus[al] to relocate" the monument and its "construction and placement" of the monument in 1912. We address each in turn.

We begin with Plaintiffs' claim that Gaston County's refusal to move the monument violates their "rights to equal protection." In *Alamance County*, the plaintiffs argued—as Plaintiffs do here—that the county's "discriminatory intent behind [its] decision not to move the [m]onument" violated our state constitution's Equal Protection Clause. *Alamance Cnty.*, 293 N.C. App. at 113, 900 S.E.2d at 229. This Court disagreed. The county's "intent in not relocating the [m]onument," we said, was "irrelevant." *Id.* The Monument Protection Law "forb[ade] [the county] *from moving the [m]onument.*" *Id.* That statute, not the county's intent, was "the reason that the [m]onument ha[d] remained in front of the courthouse." *Id.* Because counties "can only act within the boundaries set forth by the General Assembly," the county's "hands [we]re tied." *Id.*

So too here. The Monument Protection Law bars Gaston County from removing the monument except under certain conditions, none of which are present here. Plaintiffs' refusal-to-relocate claim thus fails under *Alamance County*.

And Plaintiffs' second claim—that the monument's "construction and placement" in 1912 violates equal protection—fares no better. Even assuming, as we must at summary judgment, that Plaintiffs provided "abundant evidence" proving the monument's presence "evidences a discriminatory purpose on the part of Gaston

County," we hold that the County did not violate our state constitution's Equal Protection Clause. Proving discriminatory intent alone is not enough. Plaintiffs must also show the County's erection of the monument had "disproportionate effects along racial lines." *Moore*, 384 N.C. at 453, 886 S.E.2d at 140 (citation omitted); *United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect *and* that it was motivated by a discriminatory purpose." (emphasis added) (cleaned up)). They have not done so.

Plaintiffs point to three categories of evidence they say demonstrate the monument's "placement . . . has result[ed] in significant adverse impacts to Gaston County's Black residents." But before we address that evidence, we must identify what "impact" Plaintiffs rely on as the basis for their claim. Cases addressing a "disparate impact" or "adverse impacts" from racial discrimination all involve some legal wrong beyond racial discrimination alone.

Consider a few examples:

- In *Yick Wo v. Hopkins*, two Chinese launderers alleged that they and about 200 other Chinese launderers were denied the ability to operate their laundries, while 80 non-chinese launderers were permitted to do so. 118 U.S. at 373-74.

- In *Castaneda v. Partida*, the defendant's evidence showed that although roughly 79% of the county's population was Spanish-surnamed, only 39% of grand jurors were Spanish-surnamed from 1962 to 1972. 430 U.S. 482, 486-87 (1977).

- In *Hunter v. Underwood*, a provision in the 1901 Alabama Constitution disenfranchised persons convicted of crimes involving "moral turpitude." 471 U.S. 222, 227 (1985). By 1903, the provision "had disfranchised approximately ten times as many blacks as whites." *Id.* And "the disparate effect . . . persist[ed]." *Id.* In some counties, Black Alabamians were "at least 1.7 times as likely as whites" to be disenfranchised under the state constitution for committing "nonprison offenses." *Id.*

In each case, discriminatory conduct caused concrete, identifiable harm: denial of business licenses, exclusion from jury service, loss of voting rights. The "impact" was not merely how people felt about the discrimination but what it prevented them from doing or obtaining.

The meaning of "impact" reinforces this point. As a noun, it means "the force or impression of one thing on another[;] a significant or major effect." *Impact*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). As a verb, it means "to have a direct effect or impact on." *Id.* Either way, "impact" carries an element of causation. In this context, then, Plaintiffs must show that Gaston County's discrimination in installing and maintaining the monument has caused some significant negative effect—one that amounts to a legal wrong against Plaintiffs or Black Gaston County residents.

With these definitions in mind, we turn to Plaintiffs' evidence, taking it as true. First, they presented a study by Dr. Lucy Britt, an Assistant Professor in the Department of Politics at Bates College. Plaintiffs assert that the study contains

"extensive statistical evidence" showing the monument's "statistically-significant negative impact on Black citizens," with "no such impact on White citizens." Based on her "training, expertise, and review of the scholarly materials," Dr. Britt concluded, in relevant part:

- Today, Black Southerners are much more likely than white Southerners to see Confederate symbols as representative of racial hate and injustice. . . .

- There are important racial differences in the impact of Confederate symbols—they negatively impact Black Southerners and often have no impact on white Southerners.

- Members of racial minority groups, including Black Americans, tend to have more negative baseline attitudes towards the courts and the judicial system's legitimacy, fairness, and openness than white Americans.

At the summary judgment hearing, Plaintiffs' counsel stated this case was "not simply about the individual feelings or reactions of our individual [P]laintiffs." Dr. Britt's study, counsel said, shows that "the monument makes [B]lack residents feel less welcome," "more likely to avoid entering the courthouse," "more likely to fear for their safety," and "significantly less likely to feel" the court "will treat them fairly." According to Plaintiffs, the study addresses "the disparate impact" on "[B]lack residents in Gaston County."

But, as we explain below, Dr. Britt's study doesn't purport to address "[B]lack residents in Gaston County." We must review Plaintiffs' evidence "indulgently" for

summary judgment, but we must also engage with the actual evidence—as Plaintiffs contend the trial court failed to do. *Caldwell*, 288 N.C. at 378, 218 S.E.2d at 381 (citation omitted).

So we start with what the study actually covers. Dr. Britt conducted it "in connection with a lawsuit in Alamance County, North Carolina" and "sampled residents of North Carolina," including "783 Black and 902 White respondents." She intentionally excluded people of all races other than White and Black because "Black North Carolinians are the group most likely to be directly adversely impacted by the presence of Confederate statues on courthouse grounds."

The study's respondents "were asked to read a brief news report coming out of North Carolina" and then "answer a few questions about the courthouse they just read about." Respondents "were randomized to receive one of three possible" reports—call them Report A, Report B, and Report C. Each report "included an image and statement about an anniversary of a nearby county courthouse in North Carolina."[15] Report A was the study's "control[led] condition." It contained "an image of a courthouse" and stated that "this year marks the 100th anniversary of the courthouse's construction." Report B used the same image but also "included [a] Confederate statue . . . situated in front of the [courthouse]" and stated that "this year marks the 100th anniversary of the erection of the Confederate statue in front of the

---

[15] The images feature a courthouse and Confederate monument located in Cartersville, Georgia.

courthouse." Report C included the same image and statement as Report B but added: "Local county officials have defended the placement of the monument in recent years." The study measured respondents' answers to questions about "comfort entering, feeling welcome at, [and] safety at" courthouses, as well as their "perceptions of courthouses, the court, and the criminal justice system."

Dr. Britt's study doesn't help Plaintiffs for three reasons. First, it doesn't assess Gaston County's population. Plaintiffs must prove that *this* monument at *this* courthouse in *this* County disproportionately harms the County's Black residents. Yet the study may not include a single Gaston County resident. *See State v. Green*, 329 N.C. 686, 689, 406 S.E.2d 852, 854 (1991) (holding that the defendant "failed to make a prima facie showing" that the State violated his equal protection rights under Article I, Section 19 where he offered "statistical studies" that didn't "relate specifically to North Carolina or to the district in which [he] was tried"). Second, the study measures only self-reported feelings about a hypothetical courthouse, not anyone's actual experiences at any real courthouse. Third, Dr. Britt excluded residents of other races from her sample even though Gaston County has such residents—indeed, one individual Plaintiff alleges that he is "Hispanic."[16]

---

[16] We accept this allegation as true, though we note that neither the complaint nor any other evidence submitted by Plaintiffs clarifies the exact meaning of "Hispanic" for this Plaintiff. Because Dr. Britt's study uses U.S. Census data, we assume the term has the same definition used by the U.S. Office of Management and Budget. That definition describes a "Hispanic or Latino" person as one

Given these limitations, Dr. Britt's findings are correspondingly narrow. At bottom, her study shows that a sample of Black and White North Carolina residents (who may or may not reside in Gaston County) had more negative feelings about a picture of a generic courthouse with a monument when told it was a Confederate monument and that local county officials had "defended the placement of the monument in recent years." Black respondents were more likely to have negative feelings than White respondents. And unsurprisingly, the respondents Dr. Britt pre-identified as "most likely to be directly adversely impacted" reported that they were adversely impacted—if we define "impact" as negative feelings. That's the extent of her findings: subjective feelings or perceptions about a hypothetical courthouse.

But hypothetical feelings about a generic courthouse are not evidence of actual harm at the Gaston County Courthouse. The study says nothing about anything that has happened at any court proceedings there. Although respondents stated they

---

of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race. These standards generally reflect a social definition of race and ethnicity recognized in this country . . . .

People who identify with the terms "Hispanic" or "Latino" are those who classify themselves in one of the specific Hispanic or Latino categories listed on the decennial census questionnaire and various Census Bureau survey questionnaires—"Mexican, Mexican Am., Chicano" or "Puerto Rican" or "Cuban"—as well as those who indicate that they are "another Hispanic, Latino, or Spanish origin."

U.S. Census Bureau, *What is Hispanic Origin?*, https:// www.census.gov/quickfacts/fact/note/US/RHI625223 (last visited Jan. 23, 2026).

would *feel* unwelcome at such a courthouse with a Confederate monument, Plaintiffs presented no evidence that anyone has actually been deterred from accessing the Gaston County Courthouse.

Next, Plaintiffs offered an affidavit from Dr. Blackshear—a licensed clinical psychologist, the Associate Vice President for Student Affairs & Dean of Students, and the Associate Vice Provost for the Office of Undergraduate Education at Duke University. Plaintiffs' attorneys asked Dr. Blackshear "to provide them with an opinion about the *potential psychological impact* of the Confederate monument located at the entrance of the Gaston County Courthouse," particularly "how the presence of the monument might influence the participation of Black and [W]hite North Carolinians in the court system." (Emphasis added.) Plaintiffs claim this affidavit "bolster[s] Dr. Britt's statistical analysis" by showing the monument causes "harmful psychological effects on Black citizens by causing insecurity, fear, and a sense of exclusion." This evidence, they contend, supports Plaintiffs' claim of a "significant adverse effect" on Gaston County's Black residents. But again, we must consider the actual evidence, not just Plaintiffs' conclusory descriptions of it.

Dr. Blackshear's affidavit provided a brief history of the Civil War and Reconstruction. He explained that Black Americans initially "made some progress" after the War, gaining "civic engagement, education, and property ownership" that led to "voting rights and representation in government." But "[s]upporters of the Confederacy . . . systematically engaged in tactics to reverse these gains," and usher

in the Jim Crow Era—a period marked by "funding the raising of Confederate monuments." He concluded: "[B]ecause of this history, which marks an emotional and psychological trauma on the community of Gaston County, the monument in front of the Gaston County Courthouse perpetuates harmful psychological effects on Black citizens."

No one disputes this history. And Gaston County doesn't dispute that the monument may cause some Black Gaston County residents "psychological" harm. But that's not the question. The question is whether the monument's "construction and placement" has actually caused "a meaningful disparate impact along racial lines." *Holmes*, 384 N.C. at 440, 886 S.E.2d at 132. Dr. Blackshear's affidavit does not answer it.

He identifies no instance of psychological harm or actual deterrence from courthouse access. He does not point to a single Black resident who was psychologically harmed by the monument, was prevented from accessing the courthouse, or whose case was adversely affected by the monument's presence. Instead, he made general conclusions based on layers of assumptions.

Dr. Blackshear stated that "[f]or many Black Americans, seeing the Confederate monument at the gateway to the court will be psychologically harmful and dispiriting." Black residents, according to Dr. Blackshear, "may attempt to avoid participation in court (such as jury service) rather than remain in a courthouse committed to honoring Jim Crow era values of racism and [W]hite supremacy." Dr.

Blackshear also observed that "many [W]hite individuals" committed "to equity and justice . . . will [be] intimidated or discouraged from full participation in the judicial system if they interpret the . . . monument as signifying that their commitment to fairness, equity, and justice under the law is not supported or tolerated." So "some [W]hite citizens who hold more egalitarian views" will also be discouraged "from full participation in the jury and other aspects of the judicial process.

Despite Dr. Blackshear's opinion that the monument may make people—Black or White—feel "intimidated or discouraged from full participation in the judicial system," he provides no evidence of actual impairment to anyone's participation. And his affidavit has another problem: It describes equal harm, not disparate impact. By his own account, the monument discourages participation by *both* Black and White citizens "committed to equity and justice." So Dr. Blackshear's affidavit may show a disparate impact along ideological lines—between people of all races "committed to equity and justice" and others not "committed" to these values—but it does not show a "disparate impact along racial lines." *Id.*

Other evidence supports this point. The Board's meeting's minutes and public comments show that negative feelings about the monument were not limited to people identifying as Black. Comments from the public and news articles supporting the monument's removal and expressing distress about its presence came from people of various races.

"[A] meaningful disparate impact along racial lines" requires something different. *Id.* In *Hunter v. Underwood,* the Supreme Court analyzed a provision in the 1901 Alabama Constitution that disenfranchised persons convicted of crimes involving "moral turpitude." 471 U.S. at 229. The provision's discriminatory impact—its "disparate effect"—was the actual disenfranchisement of a disproportionate number of Black people. *Id.* at 227.

> The registrars' expert estimated that by January 1903 [the provision] had disfranchised approximately ten times as many blacks as whites. This disparate effect persists today. In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under [the state constitution] for the commission of nonprison offenses.

*Id.* (citation omitted). The Supreme Court did not disturb this finding on appeal. *Id.*

Unlike in *Underwood*, we have no evidence the monument affects Black residents at rates substantially higher than White residents. Dr. Blackshear's affidavit described psychological harm to both Black and White citizens but identified no racial disparity in that harm's distribution or severity. Without such evidence, Plaintiffs cannot establish the "disproportionate effects along racial lines" required to prove an equal protection violation. *Id.*

Finally, Plaintiffs submitted what they describe as "firsthand testimony describing precisely how the [monument] harms them and other [Gaston County] Black citizens . . . on an on-going basis." This testimony includes two declarations.

The first came from Chris Thomason—President of the NAACP Gaston County Branch and a Gaston County resident for over 50 years. He described feeling "disappointment, helplessness, pain, and anger" when "forced to see the [m]onument in front of the Courthouse." His "[f]riends, relatives, colleagues, and other community members," he said, "share those feelings." Because of the monument, he "do[es] not believe that [he], or other Black residents, have equal and fair access to justice in Gaston County." Every courthouse visit makes him feel he "will not be treated the same way by jurors or officers of the court as White people." He must "stand out and be the exception to preconceived, prejudiced notions about Black people in America" to get "even a glimpse of justice." He stated that "in recent years, [he] ha[s] attended several events, including protests and vigils, taking place in the area in front of the Courthouse and around the [m]onument."

The second declaration came from Guy Flemming—Activities Coordinator for the Gaston County chapter of the NABVETS and a Gaston County resident. In his declaration, he noted that he views the monument as a "symbol of intimidation, oppression, and injustice" that "conveys a racially disparaging message" and makes him "fear for the safety of Black people in Gaston County." It forces him to "question whether Black people will be treated fairly by the Court and its officers and whether justice will truly be served." "[O]ther Black residents," he maintained, have told him they believe the monument doesn't "represent[ ] them, their history, their values, or

their beliefs." Flemming concluded that the monument "signifies that people of color will not be treated the same way by jurors or officers of the court as White people."

These declarations fall short. We accept as true Mr. Thomason's and Mr. Flemming's statements about their feelings, but Plaintiffs must show more than that some Black residents have negative feelings about the monument, even if their feelings are entirely understandable. They must prove that the monument's presence has some effect on courthouse operations and that this harm falls disproportionately on Black residents. And despite Mr. Thomason's strong negative feelings about the monument, he did not claim that he was actually deterred from accessing the courts—indeed, he participated as a Plaintiff in this very case.[17]

In the end, Plaintiffs presented no evidence of any specific "impact" beyond negative feelings about the monument. Before the trial court, Plaintiffs' counsel acknowledged as much. In response to the trial court's question about the monument's "disparate effect," he stated:

> [T]he disparate impact that I identified is not a disparate impact—*it is not a claim that the judges or any Court officials are acting differently for treating black residents differently*. The impact is on the black residents themselves, [y]our [h]onor. The impact is just against— statistically shown that they *may not even feel comfortable getting to the courthouse door* because of the impact of this monument.

---

[17] To be clear, we do not suggest that Plaintiffs' concerns described in these declarations are anything but genuine—we merely hold that they do not establish the requisite disproportionate impact for purposes of an equal protection claim.

> *Your [h]onor is correct that there is nothing in our claims that is showing that there is an actual disparate result in the judicial outcome.* Now, I am not saying that there is or isn't, but *we have not made that evidentiary showing.* That would be very complicated. . . . [O]ur showing is a showing of a direct disparate impact on black residents in the way that they *perceive* access to justice in their ability—in the way they will access the courtroom in their belief that they are getting a fair shake.

(Emphasis added.) Without "that evidentiary showing," Plaintiffs cannot show the required disproportionate racial impact for an equal protection claim.

### III.    Conclusion

Plaintiffs produced no evidence creating a genuine issue of material fact on either claim. The trial court properly concluded that Gaston County violated neither the Open Courts Clause nor the state Equal Protection Clause. We therefore affirm.

AFFIRMED.

Judges CARPENTER and WOOD concur.